## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

ESTATE OF MEGAN LARRICK, deceased, by administrator SERENA LARRICK,

                       Plaintiff,

         -vs-

TUSCARAWAS COUNTY, et al.,

                     Defendants.

Case No. 5:21-cv-00959

JUDGE PAMELA A. BARKER

MEMORANDUM OPINION AND ORDER

Pending before the Court are three motions.  First, on April 17, 2023, Defendants Tuscarawas County, Orvis Campbell, Daniel Border, Caden Brown, Marianne Collins, Dave DiGenova, Cruz Fondriest, Vonda Hamilton, John Pittman, BrieAnna Schwab, and Julie Scott (collectively, "Defendants") filed a joint Motion for Summary Judgment.  (Doc. No. 24.)  On May 24, 2023, Plaintiff Serena Larrick ("Plaintiff"), administrator of the estate of the deceased Megan Larrick ("Larrick"), filed an Opposition to Defendants' Motion for Summary Judgment, to which, on June 6, 2023, Defendants replied.  (Doc. Nos. 37, 38.)

Second, on April 30, 2023, Defendants filed a Motion for Order Excluding Expert Opinions and Report.  (Doc. No. 28.)  On May 15, 2023, Plaintiff filed an Opposition to Defendants' Motion to Exclude Expert Report.  (Doc. No. 32.)  Defendants did not file a reply.

Third, on June 20, 2023, Plaintiff filed a Motion to Strike New Arguments from Defendants' Reply, or, in the alternative, for Leave to File Surreply *Instanter*.  (Doc. No. 39.)  On July 5, 2023, Defendants filed an Opposition to Plaintiff's Motion to Strike, to which, on July 6, 2023, Plaintiff replied.  (Doc. Nos. 40, 41.)

For the following reasons, the Court DENIES Defendants' Motion to Exclude Expert Opinions and Report (Doc. No. 28) and Plaintiff's Motion to Strike New Arguments (Doc. No. 39). And the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment.  (Doc. No. 24.)

## I.  Background

This lawsuit arises out of the death of 21-year-old Megan Larrick, who, late in the afternoon on May 9, 2019, was found dead by corrections officers ("CO") in a cell within the booking area of the Tuscarawas County jail.  (Doc. No. 24-22; Doc. No. 27-1, PageID# 357-60.)  The medical examiner determined Larrick's cause of death to be acute methamphetamine, fentanyl, acetyl fentanyl, and cocaine toxicity.  (Doc. No. 24-21, PageID# 261.)  Larrick's mother, and the administrator of her Estate, Serena Larrick, filed the instant case against Defendants Tuscarawas County, Sheriff Orvis Campbell, and COs Daniel Border, Caden Brown, Marianne Collins, Dave DiGenova, Cruz Fondriest, Vonda Hamilton, John Pittman, BrieAnna Schwab, and Julie Scott.[1]  (*See* Doc. No. 1.)

### A.  Factual Background

#### 1.  Pre-Arrest

Sometime between 2:00 p.m. and 3:30 p.m. on May 8, 2019, Serena Larrick picked up Megan Larrick's infant daughter from Megan.  (Doc. No. 27-2, PageID# 435, 437, 439.)  Megan was visiting her father Tim Larrick's house.  (*Id.* at PageID# 431.)  Serena had a discussion with Megan at that time.  (*Id.* at PageID# 437.)  Based on Serena's interaction with Megan, she believed that Megan was high because Megan's face was flushed, her eyes were glassy, and she looked "funny," meaning that,

---

[1]  As discussed *infra*, Plaintiff does not oppose Defendants' Motion as to Defendants Border, Brown, Hamilton, and Scott. (*See* Doc. No. 37, PageID# 2471.)

from Serena's perspective, Megan looked "guilty." (*Id.* at PageID# 438, 449.)  Megan kissed her daughter goodbye, and Serena loaded the baby into the car and left.[2] (*Id.* at PageID# 451-52.)

### 2.  Larrick's May 8, 2019, Arrest and Arrival at Guernsey County Jail

Later in the evening on May 8, 2019, Cambridge, Ohio police arrested Larrick based on a warrant for failing to meet with her probation officer. (Doc. No. 27-2, PageID# 421; Doc. No. 24-2.)  Around 7:24 p.m., Cambridge police delivered Larrick to the Guernsey County jail. (*See* Doc. No. 24-7.)  In the bodycam videos of Larrick's arrival at the Guernsey County jail, a female officer asks Larrick if she has been drinking prior to her arrest. (*Id.*)  Larrick initially responds that she has been drinking "a lot." (*Id.*)  The officer asks, "A lot?" (*Id.*)  Larrick replies, "Not a whole lot.  A couple beers." (*Id.*)  The officer also asks Larrick, "Any kind of drugs?"  Larrick responds: "All kinds." (*Id.*)  The officer asks if Larrick has any weapons or drugs on her, and Larrick responds "No." (*Id.*)  At timestamp 19:25:50, the officer asks Larrick if "there's anything inside of you that shouldn't be there?" to which Larrick responds "No." (*Id.*)

In both bodycam videos, the skin around Larrick's eyes is red and puffy, and her nose appears red and swollen. (*Id.*; *see also* Doc. No. 24-8.)  Larrick speaks slowly and quietly. (Doc. No. 24-7.)  In the second, longer bodycam video, Larrick walks slowly over to the booking desk. (Doc. No. 24-8.)  Larrick repeatedly rubs her eyes and face, and her eyes appear to water frequently. (*Id.*)  She also struggles to remove her jewelry and piercings when an officer asks her to do so. (*Id.*)  At 19:31:09, she asks an officer if she can sit down. (*Id.*)  At 19:31:41, she asks again, "May I please sit down?  I'm going to be struggling here." (*Id.*)

---

[2] For the remainder of this Memorandum Opinion, the Court will refer to Serena Larrick as "Plaintiff" and Megan Larrick as "Larrick."

New Philadelphia police officer Kyle Kelley ("Kelley") transported Larrick from the Guernsey County jail to Tuscarawas County jail.  (Doc. No. 24-9, ¶ 4.)  Kelley picked up Larrick at the Guernsey County jail at 11:18 p.m.  (*Id.* at ¶ 6.)  He transported Larrick to the Tuscarawas County jail in his police cruiser.  (*Id.* at ¶ 7.)  Kelley averred that Larrick carried on a coherent conversation with him throughout the ride and had no difficulty getting in or out of the police cruiser.  (*Id.* at ¶ 9.)

### 3.  Larrick Arrives at the Tuscarawas County Jail

At 12:15 a.m. on May 9, 2019, Kelley and Larrick arrived at the Tuscarawas County jail.  (*Id.* at ¶ 7; Doc. No. 34-3, PageID# 2287.)  Three Tuscarawas County COs were present at the time Larrick arrived at the jail: Defendants John Pittman ("Pittman"), Marianne Collins ("Collins"), and Dave DiGenova ("DiGenova").

### a)  Relevant Tuscarawas County Policies and Procedures

The Tuscarawas County Sheriff's Office maintains certain written policies and procedures for the county jail.  Before setting out the events that transpired at the jail on May 8 to 9, 2019, the Court will briefly summarize certain written policies and procedures that are relevant to the instant case.

### (1)  Intoxication & Detoxification Policy

Tuscarawas County Policy Number (09) 023 is titled "Intoxication & Detoxification."  (Doc. No. 33-4, PageID# 2052.)  This policy requires the booking sergeant to audit the booking files and confirm that the medical staff has been advised as to all pertinent information relating to a detainee's withdrawal or possibility of withdrawal.  (*Id.*)  If a shift sergeant or officer-in-charge is concerned about withdrawal when medical staff are not on site, the sergeant and/or OIC have standing orders to contact the medical director for further instructions.  (*Id.* at PageID# 2053.)  According to the policy,

4

if an inmate becomes unresponsive or incoherent due to suspected alcohol and/or drug intoxication, the inmate "shall be immediately transferred to Union Hospital by squad." (*Id.*)

The policy lists written procedures for handling inmates showing signs of intoxication and/or detoxification from alcohol, benzodiazepines, marijuana, opiates, and stimulants. (*Id.* at PageID# 2053-56.) The policy requires that inmates showing signs/symptoms of intoxication be administratively segregated away from the general population until a safe level of sobriety is observed. (*Id.*) The policy further requires that inmates be drug tested prior to starting detoxification protocols. (*Id.*)

According to DiGenova, the night shift supervisor working overnight from May 8, 2019, through May 9, 2019, the medical staff could ask the COs to put a detainee on "an intox/detox policy" if the detainee was going through withdrawals. (Doc. No. 27-4, PageID# 580-81.) When asked how the medical staff would be alerted to the fact that a detainee was experiencing withdrawals, DiGenova testified that he believed "the inmate might fill out paperwork to the medical department." (*Id.* at PageID# 581.) According to DiGenova, booking officers and COs would not call medical in a situation in which a detainee was experiencing withdrawal. (*Id.*) Further, DiGenova testified that neither he nor another sergeant ever call medical if he or another sergeant observe a detainee experiencing withdrawal symptoms. (*Id.*) When asked "[u]nder what circumstances would [he] call medical during the booking process," DiGenova replied that he "wouldn't," and that he never would. (*Id.* at PageID# 584-85.) Further, when asked under what circumstances a booking officer should call medical during the booking process, DiGenova testified that he "wouldn't see any reason for him to." (*Id.* at PageID# 585.) During his 19 years working as a corrections officer, DiGenova never saw

5

anyone call the medical staff, or consult with the jailhouse medical staff, during the booking process for any reason.  (*Id.* at PageID# 586.)

DiGenova testified that he was only responsible for making the call about whether Tuscarawas County's Intoxication & Detoxification policy would be initiated "[i]f it was brought to [his] attention," but that in Larrick's case, "it was never brought to [his] attention" and he "didn't see anything either."  (*Id.* at PageID# 622.)  He testified that another booking officer could have asked him about initiating the policy, but no one ever asked him.  (*Id.* at PageID# 623.)  In DiGenova's experience, he had never initiated the Intoxication & Detoxification policy during the booking process, and, to his knowledge, no other officer had ever initiated the policy at the time of booking either.  (*Id.*)

According to DiGenova, at the time of Larrick's arrest, the Tuscarawas County jail had a policy that any new detainee who arrived too drunk or too high would be "kicked right back out and taken to the hospital" by the arresting officer so that the hospital staff could clear the detainee before the individual could enter the Tuscarawas County facility.  (*Id.* at PageID# 576-77.)  According to DiGenova, jail staff would evaluate whether someone was too drunk or too high to be booked into the jail by visual cues, including if someone could not stand on their own, if their speech was too slurred, or if their eyes were glazed or bloodshot.  (*Id.* at PageID# 577.)  DiGenova indicated that the ability to evaluate those visual cues "just [came] from experience," and that "there's no book" or specific training.  (*Id.*)  Rather, according to DiGenova, the ability to identify a detainee who is too intoxicated to remain at the jail "just comes from 19 years of watching people who have come through the facility."  (*Id.*)  DiGenova also testified that detainees often do not tell officers the truth about their drug and/or alcohol consumption.  (*Id.*)

**(2)     Administrative Segregation Policy**

Tuscarawas County Policy Number (15) 001 is titled "Administrative Segregation."  (Doc. No. 33-2, PageID# 1452.)  In relevant part, the Administrative Segregation policy allows an inmate to be separated from the general population for several reasons, including if he poses a threat to self, others, or the security of the jail or if the jail administrator, or designee, determines that such segregation is necessary, and in the inmate's best interest.  (*Id.*)  To place an inmate on administrative segregation, the on-duty shift supervisor must complete and approve the administrative segregation form.  (*Id.* at PageID# 1453.)  A copy of the form will be forwarded to the medical staff and placed in the inmate's file.  (*Id.*)  The policy dictates that inmates who are administratively segregated due to a medical condition be placed in a booking cell during their segregation period.  (*Id.* at PageID# 1454.)

**(3)     Reception & Release Policy**

Tuscarawas County Policy Number (01) 001 is titled "Reception & Release."  (*Id.* at PageID# 1478.)  This policy requires, in pertinent part, that "a booking and identification record shall be made of every commitment . . . ."  (*Id.*)  This policy also mandates that "[i]nmates shall not be confined in the reception area for more than twelve hours except when security, health and mental health concerns are being addressed."  (*Id.*)

**(4)     Inmate Personal Observation Checks Policy**

Tuscarawas County Policy Number (03) 014 is titled "Inmate Personal Observation Checks."  (*Id.* at PageID# 1585.)  According to this policy, COs must conduct personal observation checks of inmates "every sixty minutes on an irregular schedule."  (*Id.*)  When conducting these range checks,

7

COs check for a variety of criteria, including checking inmates' "health and safety" and verifying that there is no abnormal behavior on the inmates' part.  (*Id.* at PageID# 1586.)

### (5)    Inmate Pre-Screen Policy

Tuscarawas County Policy Number (09) 002 is titled "Inmate Pre-Screen."  (Doc. No. 33-4, PageID# 2104.)  This policy requires that, when a new inmate arrives at the jail, "health-trained personnel" inquire about several conditions, including whether the inmate is experiencing "current serious or potentially serious medical or mental health issues needing immediate attention."  (*Id.*)  The policy requires that staff document a variety of events, including if the inmate is complaining of any medical problems, if the inmate has any visible signs of alcohol/drug use, and if the inmate displays any visible signs of drug use.  (*Id.* at PageID# 2105.)  The policy also requires that COs document the inmate's acceptance into the jail and that the inmate sign his name on the form.  (*Id.*)

### (6)    Inmate Receiving Screen Policy

Tuscarawas County Policy Number (09) 003 is titled "Inmate Receiving Screen."  (*Id.* at PageID# 2106.)  This policy requires that "health-trained personnel" perform a written medical, dental, and mental health receiving screening on each inmate upon arrival at the jail and prior to being placed in general population.  (*Id.*)  According to this policy, staff must inquire whether the inmate has used alcohol and drugs, including types, amounts, and frequency of use, date or time of last use, and history of problems (i.e., withdrawal) after cessation, among other inquiries.  (*Id.*)  Staff is required to observe the inmate's behavior, including state of consciousness, appearance, conduct, and physical appearance of skin, including trauma markings and needle marks and/or other indications of drug abuse.  (*Id.* at PageID# 2107.)  The procedure requires that every inmate booked into the facility be asked the medical screening questions and his responses documented, that the medical screening

8

form be signed and dated by both the booking officer and the inmate, that the inmate be referred to medical personnel if a referral is deemed necessary, and that any inmates placed in administrative segregation for valid medical concerns have the appropriate forms completed and appropriate staff notified for follow-up treatment.  (*Id.*)

### b)      Pittman, Collins, and DiGenova

When Larrick arrived at the Tuscarawas County jail on May 9, 2019, there were three COs waiting for her in the booking area of the jail: Pittman, Collins, and DiGenova.  Pittman was the booking officer on duty that night.  (Doc. No. 27-6, PageID# 873.)  According to Pittman, the booking officer's responsibilities include completing the booking process for newly arrived detainees (including collecting pertinent medical information from detainees and completing several forms for each new detainee) and conducting range checks on detainees confined to the booking area.  (*Id.* at PageID# 873, 876.)  Prior to working at the Tuscarawas County jail, Pittman did not have any law enforcement experience.  (*Id.* at PageID# 829, 830-31.)  He worked for many years as a cowboy in Colorado before returning to Ohio to work in iron welding.  (*Id.*)  Tuscarawas County hired him as a CO in February 2013, after his friend Sheriff Orvis Campbell encouraged him to apply for the job.[3] (*Id.*)

Pittman attended the corrections academy through Stark County and became an instructor on "subject control" for the Tuscarawas County Sheriff's Office, as well as for the Stark County corrections academy.  (*Id.*)  According to Pittman, most of his training was "on-the-job training," in which he was paired with, and shadowed, senior officers to learn how the jail setting worked.  (*Id.* at

---

[3]  Thus, Pittman's own testimony that his first job in law enforcement was in 2013 when he was hired to work at the jail does not comport with jail administrator Ken Engstrom's testimony that Pittman's health training included "20-plus years of experience."  (Doc. No. 33-3, PageID# 2023.)

PageID# 832.)  Pittman recalled that he did various annual trainings on first aid, CPR, and dispensing medications to inmates.  (*Id.* at PageID# 838.)  He did not recall completing any annual trainings about intoxicated inmates and/or inmates detoxing from alcohol and/or drugs but noted that learning how to deal with intoxicated inmates was the type of thing he learned on the job.  (*Id.*)  According to Pittman, he learned to discern whether inmates were or were not intoxicated based on his experience working at the jail.  (*Id.* at PageID# 838-39.)  Pittman testified that if an inmate self-reported that she had taken drugs or that she was high, he might make additional documentation as to the inmate's condition, depending on whether the inmate was exhibiting abnormal symptoms.  (*Id.* at PageID# 847.)  In September 2019, Pittman quit his job as a Tuscarawas County CO and returned to the welding and fabrication industry.  (*Id.* at PageID# 924.)

Collins was also present that night.  (Doc. No. 27-5, PageID# 738.)  Though Collins was assigned to work the master control post and not the booking post that night, she came down to assist Pittman in booking when Larrick arrived because a female officer was required to perform Larrick's pat down.  (*Id.* at PageID# 738, 750.)  In 1999, Collins began working at the Tuscarawas County jail as a cook, and later in 2002, the jail hired her as a CO.  (*Id.* at PageID# 716-17.)  Collins completed a variety of annual trainings as a CO, including on CPR, blood-borne pathogens, and mental health.  (*Id.* at PageID# 718.)  Collins also completed training on how to administer Narcan in case of an overdose emergency.  (*Id.* at PageID# 723-24.)  Collins testified that, other than providing first aid and potentially using Narcan in case of emergency, she and the other COs do not treat a detainee's sickness or illness in any way.  (*Id.* at PageID# 724.)  Rather, she will go through the medical staff and the medical staff will handle care instead.  (*Id.*)  Collins testified that if a medical staff person is not present at the jail, COs know to call the medical staff person on call.  (*Id.* at PageID# 726.)  Collins

10

testified that when an intoxicated detainee arrives at the jail, she evaluates the detainee's state of intoxication based on what they tell her.  (*Id.* at PageID# 727-28.)

DiGenova was also present at the time Larrick arrived at the jail.  (Doc. No. 27-4, PageID# 680-81.)  As the nightshift sergeant, DiGenova was the shift supervisor.  (*Id.* at PageID# 589.)  DiGenova worked as a CO in the Tuscarawas County jail from November 2000 through July 2019.  (*Id.* at PageID# 553-55.)  DiGenova was promoted to jail sergeant in October 2010.  (*Id.* at PageID# 558.)  In July 2019, DiGenova transferred out of the jail and to the Tuscarawas County Sheriff Department's road division.  (*Id.*)

DiGenova completed his corrections academy course in 2000 and completed various on-the-job trainings during his time as a CO.  (*Id.* at PageID# 556-57.)  DiGenova testified that most of his relevant CO training was "on-the-job" training acquired through everyday experience.  (*Id.* at PageID# 557.)  DiGenova completed CPR, first aid, and Narcan trainings while employed as a CO.  (*Id.* at PageID# 559.)  However, when it came to training related to drugs or alcohol, DiGenova testified that that sort of training was based "more [on] experience dealing with those kinds of people who would come in, drug and alcohol, under the influence."  (*Id.*)  DiGenova also completed "first-line supervisor" training related to his role as sergeant.  (*Id.* at PageID# 560-61.)

According to DiGenova, his job duties as sergeant included pitching in when one of his officers requested assistance and sitting in the sergeant office, typing the shift log, a document that lists all movement within the jail (e.g., lockdowns, new arrivals to the jail, detainees visiting the medical office, etc.).  (*Id.* at PageID# 574.)  Though DiGenova's sergeant duties did not require him to do so, he made a habit of going down to booking every time a new detainee arrived.  (*Id.* at PageID# 621.)

11

### c)     Larrick's Intake Process

According to Pittman, Larrick came into the jail and was "very calm, collected," and not argumentative or aggressive.  (Doc. No. 27-6, PageID# 871.)  He believed that she "looked fine." (*Id.*)  Although Pittman recalled that Kelley had informed him that Larrick had done drugs that night, Pittman claimed that he did not see any "signs of that."  (*Id.* at PageID# 876-77.)

Pittman recalled that he spoke briefly with Kelley.  (Doc. No. 27-6, PageID# 871.)  According to Pittman, Kelley reported to Pittman that Larrick "had said that she had done drugs and alcohol that night."  (*Id.* at PageID# 879.)  Pittman also recalled that, upon Larrick's arrival, Collins immediately patted Larrick down and "took her straight back to the shower."  (*Id.* at PageID# 871.)  Pittman did not recall Larrick having any trouble walking down to the shower with Collins.  (*Id.*)

Collins recalled that Kelley told her that "he suspected that [Larrick] had drugs on her." (Doc. No. 27-6, PageID# 749.)  As Collins patted Larrick down, she asked Larrick "[a]re you using?"  (*Id.*) Larrick responded that "she used before she got to Guernsey County."  (*Id.*)  Larrick did not tell Collins what drugs she used.  (*Id.* at PageID# 750.)  Based on Kelley's suspicion and Larrick's admission that she had used drugs that night, Collins immediately took Larrick back to the shower to conduct a visual inspection for drugs.  (*Id.* at PageID# 755, 766.)  Collins did not observe any hidden contraband on Larrick's body.  (*Id.* at PageID# 750, 767.)  After Larrick finished in the shower, Collins provided Larrick with a towel, her uniform and sandals, sheets, and blanket, and took her back out to the booking area.  (*Id.* at PageID# 756.)  Collins then placed Larrick in a cell in the booking area and returned to her assigned post at master control.  (*Id.*)  Because Collins wanted to check Larrick for contraband as quickly as possible, Collins did not complete Larrick's "shower sheet" (a form that lists the inventory of all personal effects, including contraband, in a detainee's

12

possession at the time of intake).  (*Id.* at PageID# 739-40, 756.)  Collins testified that she believed Pittman, the booking officer, completed the form instead.  (*Id.* at PageID# 757.)

However, after Collins placed Larrick in her cell, Pittman did not immediately book Larrick. (Doc. No. 27-6, PageID# 877.)  Instead, he decided that he would complete her booking when he could find the time to do it.  (*Id.* ("[W]e'll get you finished booked in, you know, when I get to you.").)  Indeed, after Larrick returned from the shower,[4] the only time Pittman saw her again was during his "range checks," mandatory hourly welfare checks on detainees.[5]  (*Id.* at PageID# 849, 915.)  According to Pittman, the jailhouse was short-staffed that night and so he was responsible for conducting and tracking 10-minute and/or 60-minute range checks on detainees in the booking area, as well as the "classification cells," located in a different area of the jail.  (Doc. No. 27-6, PageID# 885.)  Pittman testified that he was able to ask Larrick enough questions during the intake process that he was able to assign her a jail identification number, but he never asked her the mandatory medical questions that COs are required to ask of all new detainees or take her photo for her file.  (*Id.* at PageID# 882.)  Pittman never completed Larrick's medical assessment form to send on to the jailhouse medical staff.  (*Id.* at PageID# 883, 925.)  In other words, though Pittman began Larrick's "intake" process, he never actually booked Larrick into the Tuscarawas County jail.[6]  (*Id.* at PageID# 927.)

---

[4]  Pittman noted in his incident report that when Larrick returned from the shower, she had a smell of alcohol on her. (Doc. No. 34-4, PageID# 2293.)
[5]  Typically, COs conduct range checks on all detainees no more than 60 minutes apart to ensure detainees' safety and wellbeing.  (Doc. No. 27-6, PageID# 849-50.)  COs must then log every range check for each detainee on a range check log.  (*Id.*)  However, certain detainees require more frequent range checks.  (*Id.*)  For example, if a detainee is suicidal, the detainee will be placed on "administrative segregation" and COs must conduct range checks every 10 minutes to ensure that the detainee is breathing and not attempting to harm themselves.  (*Id.* at PageID# 850-51; Doc. No. 27-4, PageID# 580.)  Additionally, jailhouse medical staff may require COs to conduct more frequent range checks on detainees for whom such checks are medically indicated.  (Doc. No. 27-4, PageID# 580.)
[6]  DiGenova, the sergeant supervising the jail that night, testified that he was not responsible for overseeing the booking paperwork as the supervisor and that he never reviews booking paperwork to make sure it is completed.  (Doc. No. 27-4,

Pittman conducted 60-minute range checks of Larrick throughout the rest of his shift, although he noted in his incident report that he had six 10-minute watches going on, so as he was performing those 10-minute checks on other detainees, he would have glanced into Larrick's cell as he passed by. (Doc. No. 34-4, PageID# 2293.) According to Pittman, Larrick appeared to be sleeping during his range checks, but she also shifted positions between checks. (Doc. No. 27-6, PageID# 872.) He did not recall Larrick ever banging on the door or alerting him that she needed anything. (*Id.*) Sometime around 5:44 a.m., Pittman brought Larrick her breakfast tray, but she did not eat any of it. (*Id.* at PageID# 900.) Pittman wrote in his incident report that he yelled into her cell to ask if she wanted a tray, but she grunted and turned her head away to indicate that she did not want to eat breakfast. (Doc. No. 34-4, PageID# 2293.)

Around 6:31 a.m., during one of his last range checks of Larrick, Pittman noticed that Larrick was laying on her stomach and her legs were crossed in a strange way that raised a "red flag" for Pittman. (Doc. No. 27-6, PageID# 901-02.) Pittman believed that Larrick had not moved since breakfast, and he could not determine if she was breathing. (*Id.*; Doc. No. 34-4, PageID# 2293.) Pittman opened the cell door and yelled Larrick's name to confirm that she was breathing. (Doc. No. 34-4, PageID# 2293.) In response, Larrick lifted her head, grunted at Pittman, and fell back asleep. (*Id.*; *see also* Doc. No. 27-6, PageID# 901-02.)

At the end of his shift, Pittman conducted a "pass-down" with the incoming booking officer, in which he verbally reported on the night's events to the incoming booking officer. (Doc. No. 27-6, PageID# 889-90.) Pittman testified that he would have informed the incoming officer that the new officer "just need[s] to finish [Larrick's] book-in, medical questions, have her sign the paperwork,

---

PageID# 633-34.) He testified that he did not know why Larrick was never booked into the jail, even though detainees are required to be fully booked to remain at the jail. (*Id.*)

14

and then she could be moved." (*Id.*) Pittman testified that he informed the incoming booking officer that he put Larrick in the computer system, but "that's as far as [he] got with everything else going on that night." (*Id.*) Pittman believes he may have told the incoming booking officer that Larrick "stated that she had done some drugs and alcohol before she got picked up," that Larrick "appeared to have been sleeping," and that "she skipped breakfast." (*Id.* at PageID# 890.)

During his deposition, Pittman testified that he does not make any determination about whether an inmate is either detoxing or withdrawing from drugs and/or alcohol, but instead waits until the jailhouse medical team arrives in the morning to allow the medical staff to make such a determination. (*Id.* at PageID# 920.)  If Pittman had a life-or-death concern about a detainee overnight, he would call medical, but his practice was to wait until the medical staff arrived in the morning, instead of addressing medical issues like drug detox and/or withdrawal himself. (*Id.*) Pittman also testified that he never called the medical staff because he had a concern about any individual withdrawing from drugs. (*Id.* at PageID# 921.)  He testified that he understood that people came into the jail on drugs all the time. (*Id.*)  He would only call the sergeant, officer-in-charge, or medical staff if a detainee's symptoms appeared to be a matter of "life or death." (*Id.*)  Pittman testified that he could determine if a situation was "life or death" based on the detainee's observed symptoms. (*Id.* at PageID# 922.)  Pittman testified that, for example, if a detainee was struggling to breathe or was unconscious or unresponsive, those symptoms indicated that a situation was a matter of life or death. (*Id.*)  Pittman testified that he did not call the medical staff overnight between May 8-9, 2019. (*Id.* at PageID# 907.)

### 4.    Events During Day Shift on May 9, 2019

BrieAnna Schwab ("Schwab") relieved Pittman as the dayshift booking officer for May 9, 2019.  (Doc. No. 27-1, PageID# 316; Doc. No. 34-1, PageID# 2273.)  Schwab recalled that Pittman informed her during pass-down that Larrick "had been passed out sleeping for most of the night but was responsive."  (Doc. No. 34-1, PageID# 2273.)  The officer-in-charge for day shift was Vonda Hamilton ("Hamilton").  (*Id.*)  Cruz Fondriest ("Fondriest") was assigned to the "rover" post that day.[7]  (Doc. No. 27-7, PageID# 995.)

### a)    Officers Schwab and Fondriest

As of May 9, 2019, Schwab was new to law enforcement.  Her first day working as a corrections officer for Tuscarawas County was February 17, 2019.  (Doc. No. 27-1, PageID# 284-86.)  She had no prior law enforcement experience at the time, had not graduated college, or attended the police or corrections academies.  (*Id.*)  According to Schwab, she passed her corrections academy exam on April 19, 2022.[8]  (*Id.* at PageID# 286.)

During her first two weeks on the job, she completed a combination of computer trainings and on-the-job observations of other officers.  (*Id.* at PageID# 286-87.)  She mostly trained on the "rover" and booking positions, gaining hands-on experience in both roles.  (*Id.* at PageID# 287-88.)  Schwab recalled that she mostly trained with Officer Julie Scott and that Schwab's training period lasted for approximately "a few months."  (*Id.* at PageID# 288.)  Schwab's training log indicates that she

---

[7]  The day shift rover is responsible for assisting other COs by, among other things, transporting inmates from booking to housing units, assisting booking in the intake process, serving lunch, running video court, and relieving posts during other COs' breaks and mealtimes.  (Doc. No. 27-7, PageID# 997-98.)

[8]  COs are required to attend the corrections academy "within the first year of employment."  (Doc. No. 33-1, PageID# 1404.)  Schwab claimed that although she began her employment in February 2019, she did not "need the academy training right away to work here" and that the deadline to attend the academy "was prolonged due to COVID and not having academies."  (Doc. No. 27-1, PageID# 286.)

16

completed three trainings prior to May 9, 2019: "LEADS Operator Training," "LEADS Operator Certification," and "Intro to Zuercher Suite." (Doc. No. 34-1, PageID# 2269.) Schwab completed trainings in first aid, CPR, AED, Narcan administration, blood-borne pathogens, suicide prevention, fire safety, and restraining chair usage on June 13, 2019. (*Id.*)

In July 2016, Fondriest began working as a Tuscarawas County jail CO. (Doc. No. 27-7, PageID# 968-69.) Prior to working in law enforcement, he worked as an independent contractor for railroads, and, before that, he served for five years in the United States Marine Corps. (*Id.*) In October 2016, Fondriest completed Ohio's corrections academy course. (*Id.* at PageID# 971.) He also completed Tuscarawas County's mandatory quarterly trainings on topics like suicide prevention, responding to emergency situations, and fire drills. (*Id.*) Like Schwab, he shadowed a sergeant, who handled most of Fondriest's on-the-job training. (*Id.* at PageID# 972.) Fondriest often worked as the "officer-in-charge" during his shifts and once filled in for a vacant sergeant position while the county worked to fill the role. (*Id.*) Fondriest also completed other trainings on topics like crisis intervention, cell extraction, pepper spray usage, first aid, and how to administer medication when jailhouse medical staff were not present (typically during night shift). (*Id.* at PageID# 975-76.) Fondriest recalled that most of his training on evaluating inmates experiencing drug withdrawal came from on-the-job training. (*Id.* at PageID# 977.) Fondriest left his role as a corrections officer in October 2020. (*Id.* at PageID# 972.)

### b)    Larrick Remains in Booking Throughout May 9, 2019

According to Schwab, Larrick remained in the booking area throughout the day on May 9, 2019, rather than the general jailhouse population, because Larrick was never booked into the jail. (Doc. No. 27-1, PageID# 332.) Schwab claimed that contrary to Pittman's deposition testimony and

17

Schwab's own incident report, she "was told" that Larrick "refused her [booking] questions," which was why Larrick was never booked in and the medical staff was never called.[9]  (*Id.*)  Though Schwab, as the on-duty booking officer was responsible for finishing Larrick's booking process, Schwab did not attempt to book Larrick into the jail.  (*Id.* at PageID# 336, 338.)  According to Schwab, she did not attempt to book Larrick because Larrick was sleeping.  (*Id.* at PageID# 336.)  At 7:00 a.m. when Schwab's shift began, Schwab observed that Larrick appeared to be sleeping.  (*Id.* at PageID# 336-37.)  Schwab did not ask Pittman how long Larrick had been asleep prior to shift change.  (*Id.*)  When asked if Schwab believed Larrick was still asleep at 5:00 p.m. that afternoon, Schwab testified "No. I don't know.  It's not like she was sleeping all day.  So yes."  (*Id.* at PageID# 338.)  When asked why she did not attempt to finish Larrick's booking process if Larrick was not asleep all day on May 9, 2019, Schwab testified that Larrick "wasn't [her] only inmate in booking," and that "there were a multitude of book-ins, and releases, and suicide watches."  (*Id.*)  Schwab believed that "as long as [she] checked on her every so often to see if she was okay and breathing," (and Schwab claimed that Larrick *was* responsive and breathing during her checks) then, in Schwab's mind, "everything was okay."  (*Id.* at PageID# 338-39.)  Schwab admitted that she "did not have time to do every aspect of the booking job within [her] shift."  (*Id.* at PageID# 339.)  At that time, Schwab was unaware that it was a violation of Ohio's jail standards to allow a detainee to remain in booking for more than 12 hours without a medical, safety, and/or security need for doing so.  (*Id.* at PageID# 342-43.)

During the day on May 9, 2019, both Schwab and Fondriest were responsible for conducting range checks on detainees in the booking area.  (Doc. No. 27-1, PageID# 319.)  According to Schwab,

---

[9]  There is no evidence in Pittman's deposition testimony or incident report, or Schwab's incident report, that Larrick refused to answer any booking questions, or that Pittman told Schwab that Larrick refused, or was unable to, answer any booking questions.

during one of her checks she asked Larrick if she was okay and Larrick verbally responded with "fine" or "okay," or similar.  (*Id.* at PageID# 323.)  Schwab also heard the toilet flush and the water fountain run in Larrick's cell at least once after 7:00 a.m.  (*Id.*)  Schwab also recalled seeing Larrick sitting and laying in different positions throughout the day, including, for example, Larrick laying on different sides and her back, stretching, and crossing and uncrossing her arms and legs.  (*Id.* at PageID# 324.)

Schwab testified that she attempted to deliver Larrick a lunch tray and asked Larrick if she wanted her tray.  (*Id.* at PageID# 325-26.)  Schwab remembered that Larrick sat up a little, shrugged, and shook her head no.  (*Id.*)  Schwab did not alert a supervisor that Larrick had refused two meals in a row.  (*Id.* at PageID# 326-27.)  According to Schwab, there was a policy to alert a supervisor if a detainee had refused multiple meals, but only if such refusal was "concerning."  (*Id.* at PageID# 327.)  Schwab was not concerned that Larrick refused two meal trays because, based on her experience, it was not uncommon for a detainee to refuse their trays multiple times.  (*Id.*)

Sometime between 10:50 a.m. and 11:20 a.m. on May 9, 2019, Fondriest claimed that he also asked Larrick if she wanted her lunch tray.  (Doc. No. 27-7, PageID# 1007, 1009.)  Larrick told Fondriest no.  (*Id.* at PageID# 1007-08.)  Fondriest remembered feeling that, based on this interaction, Larrick needed to rest, she was clearly tired, and did not want to be bothered at that time.  (*Id.*)  He left her tray until lunchtime was over, to allow her the opportunity to eat if she decided she was hungry.  (*Id.* at PageID# 1008.)  Based on his previous experience, Fondriest believed that an individual experiencing drug withdrawal sleeps a lot and that it was not uncommon for such an individual to sleep a lot.  (*Id.*)  Fondriest did not recall noticing anything out of the ordinary about Larrick.  (*Id.* at PageID# 1010.)  Rather, he assumed that she was in withdrawal, that she would be

19

okay, and that he would move her down to female housing in a few hours.  (*Id.*)  Fondriest testified

that the staff "typically" let someone going through the withdrawal process remain in booking longer,

rather than moving the individual into the general jailhouse population, to avoid creating conflict

between an inmate still in the throes of withdrawal symptoms and other inmates.  (*Id.* at PageID#

1011-12.)

According to the May 9, 2019, range check log, Schwab's last range check of Larrick prior to

Larrick's death was at 1:17 p.m.  (Doc. No. 34-4, PageID# 2292.)  Schwab also recalled seeing

Larrick around 1:52 p.m., when Schwab was moving another detainee into a different booking cell.

(Doc. No. 27-1, PageID# 352.)  It is unclear from Schwab's testimony what she observed of Larrick

at 1:52 p.m.  Initially, Schwab testified that she saw Larrick laying on her side facing towards the

wall and that she could see Larrick's chest rising and falling, indicating that Larrick was breathing.

(*Id.*)  Then Schwab testified that she saw Larrick 10 minutes later and that Larrick was laying down

and had changed positions.  (*Id.* at PageID# 354.)  However, Schwab also testified that she did not

actually observe Larrick or her position at 1:52 p.m., but instead heard Larrick move within her cell

at that time and observed Larrick laying on her side 10 minutes later.  (*Id.* at PageID# 355.)

Fondriest completed a range check on Larrick at 2:18 p.m.  (Doc. No. 34-4, PageID# 2292.)

According to the range check log, Schwab performed the next check on Larrick more than two hours

later, at 4:31 pm.  (*Id.*)  Fondriest testified that he could not explain why there was a gap of more than

two hours between these two range checks.  (Doc. No. 27-7, PageID# 1006-07.)  He was sure that he

or another officer would have looked at Larrick during that timeframe.  (*Id.*)  Schwab testified that

although she did not conduct an official range check on Larrick between 1:17 p.m. and 4:31 p.m., she

saw Larrick between 2:00 p.m. and 4:45 p.m. during Schwab's 10-minute suicide watch checks on

20

other detainees.  (Doc. No. 27-1, PageID# 356.)  Schwab could not recall if she saw Larrick move between 2:00 p.m. and 4:45 p.m.  (*Id.*)

Sometime between 4:45 p.m. and 5:00 p.m., Schwab placed Larrick's dinner tray through the food tray chute.  (*Id.* at PageID# 357; *see also* Doc. No. 34-1, PageID# 2273.)  Schwab recalled that Larrick was lying face down on her stomach.  (Doc. No. 27-1, PageID# 358.)  Schwab did not know how long Larrick had been lying on her stomach at that point.  (*Id.*)  At 5:12 p.m., Schwab noticed that Larrick did not respond to the sound of the food chute, so Schwab keyed open Larrick's cell and asked Larrick if she wanted her food tray.  (*Id.*; *see also* Doc. No. 34-1, PageID# 2273.)  Larrick did not respond to Schwab's question.  (Doc. No. 27-1, PageID# 358.)  Schwab then entered Larrick's cell, approached Larrick, and tapped her on the shoulder.  (*Id.*)  Larrick felt cold and stiff to the touch.  (*Id.* at PageID# 358-59.)  Schwab shook Larrick's shoulder and got no response.  (*Id.* at PageID# 359.)  Schwab checked Larrick for a pulse but could not find one.  (*Id.*)

According to Schwab's incident report, at 5:15 p.m., Schwab radioed for Julie Scott ("Scott") to assist her in Larrick's cell.  (Doc. No. 34-1, PageID# 2273.)  Officer-in-Charge Vonda Hamilton ("Hamilton") responded.  (*Id.*)  Schwab told Hamilton that Larrick was unresponsive.  (*Id.*)  Hamilton came down to Larrick's cell at 5:18 p.m.  (*Id.*)  Schwab told Hamilton that she could not find a pulse on Larrick and that Larrick felt cold.  (*Id.*)  Hamilton checked Larrick, and she also could not find a pulse.  (*Id.*)  Hamilton then called for Scott.  (*Id.*)  Scott came down at 5:20 p.m. with a stethoscope but also could not find a pulse on Larrick.  (*Id.*)  At 5:28 p.m., Scott administered Narcan to Larrick, but Larrick did not respond.  (*Id.*)  At 5:30 p.m., an officer called the paramedics.  (*Id.*)  At 5:35 p.m., someone called Sheriff Orvis Campbell ("Campbell") and Schwab was relieved from booking to master control.  (*Id.*)

21

According to Hamilton's incident report, when she entered Larrick's cell, she saw Larrick lying face down.  (Doc. No. 34-5, PageID# 2313.)  She touched Larrick's shoulder and thought Larrick's body felt stiff.  (*Id.*)  Hamilton then took hold of the back of Larrick's shift to pull her up, but Larrick's entire body was stiff.  (*Id.*)  Larrick was unresponsive and "showed signs of being deceased."  (*Id.*)  Around 5:25 p.m., Hamilton called Lieutenant Ken Engstrom ("Engstrom") but got no answer.  (*Id.*)  She also called dispatch to request that Campbell be contacted immediately.  (*Id.*)  At 5:33 p.m., Hamilton spoke to Campbell about Larrick.  (*Id.*)  She then went to medical and retrieved the AED.  (*Id.*)  Around 5:35 p.m., Hamilton and Fondriest reentered Larrick's cell to attempt to use the AED machine and begin CPR.  (*Id.*)  Scott attempted chest compressions on Larrick.  (*Id.*)  At 5:39 p.m., the paramedics arrived.  (*Id.*)

According to Scott, when the EMS squad arrived, they examined Larrick and advised the jail staff to call the coroner.  (Doc. No. 27-9, PageID# 1278-79.)  Scott waited with Larrick's body until the coroner arrived from Stark County.  (*Id.* at PageID# 1280.)

### 5.    Autopsy/Toxicology Results

The coroner ordered a full autopsy and toxicology analysis of Larrick's body.  (Doc. No. 24-21, PageID# 260.)  Larrick's body was transported by ambulance to the Cuyahoga County Medical Examiner's Office.  (*Id.*)  The medical examiner performed an autopsy on Larrick's body on May 10, 2019, at 8:55 a.m.  (*Id.*)  The medical examiner determined Larrick's cause of death to be acute methamphetamine, fentanyl, acetyl fentanyl and cocaine toxicity.  (*Id.* at PageID# 261.)

During the autopsy, the examiner recovered a "[s]mall plastic bag" from Larrick's body.  (*Id.*)  In his autopsy report, the examiner noted as follows:

> Following evisceration of the intestines, a 2" x 1 ½" bloody clear plastic bag with a Ziploc-like seal is recovered from the pelvis.  The Ziploc seal is undone along

approximately one-third of the length of the seal.  A small amount of apparent tan material is in the clear plastic bag.  The bag has some full-thickness cuts in it, which were possibly made during evisceration.

(*Id.* at PageID# 264.)  There is no indication in the autopsy report or toxicology analysis that the contents of the bag discovered in Larrick's pelvis were tested.  The toxicology laboratory report indicated that cocaine, fentanyl, amphetamine, and acetyl fentanyl were present in Larrick's body at the time of her death.  (*Id.* at PageID# 265-67.)

Ultimately, the medical examiner concluded that "[b]ased upon the history and autopsy findings, it is my opinion that Megan Larrick, a 21-year-old woman, died as the result of acute methamphetamine, fentanyl, acetyl fentanyl, and cocaine toxicity."  (*Id.* at PageID# 264.)  Larrick's death certificate lists her immediate cause of death as "acute respiratory failure," with an approximate interval between onset and death of "minutes," due to acute fentanyl, acetyl fentanyl, cocaine, and methamphetamine toxicity.  (Doc. No. 24-22.)  Larrick's death certificate indicates that her injury occurred through "systemic absorption of drugs from bag located within rectum."  (*Id.*)

### 6.  Plaintiff Learns of Larrick's Death

According to Plaintiff, "three sheriffs," including Engstrom, came to her house to inform her that Larrick had died.  (Doc. No. 27-2, PageID# 417; *see also* Doc. No. 33-3, PageID# 1950.)  Plaintiff testified that "it was instant shock" when they told her the news.  (Doc. No. 27-2, PageID# 417.)  She recalled asking Engstrom if he tried to resuscitate Larrick and whether he was sure it was her.  (*Id.*)  Engstrom answered yes to both of her questions.  (*Id.*)

Engstrom testified that sometime between 6:30 p.m. and 7:00 p.m., he and a sheriff's deputy drove to Plaintiff's house to deliver the news to Larrick's next of kin.  (Doc. No. 33-3, PageID# 1948-49.)  Engstrom claimed that, after he delivered the news to her, Plaintiff told him that Larrick

23

"swallows drugs when she's concerned about being arrested" and that Plaintiff was "pretty sure [she] could tell [Engstrom] how it happened, that she had a history of swallowing—putting her drugs in a bagg[ie] and swallowing them when she thought she was going to be arrested to avoid charges." (*Id.* at PageID# 1949-50.)

When asked whether Larrick ever swallowed baggies of drugs, Plaintiff responded that Larrick once "said she had to ingest a bubble, whatever that is," and that Plaintiff did not know what "bubble" meant, because Larrick did not explain further. (Doc. No. 27-2, PageID# 419.) Plaintiff did not ask Larrick what she meant, but she "got really mad" and told Larrick that she "better not ever do it again." (*Id.*)

According to Plaintiff, Campbell visited Plaintiff's house the day after Larrick's death. (*Id.*) Plaintiff recalled that she "was a wreck." (*Id.* at PageID# 420.) When asked if she told Campbell that Larrick died of a drug overdose or if she told Campbell that Larrick "swallowed a bubble," Plaintiff replied "[m]aybe," but she could not recall because she "was a mess" and crying that day. (*Id.*) Plaintiff testified that her conversation with Campbell was not long and that he "was there for maybe five minutes." (*Id.*) Plaintiff recalled that they "talked mostly about this being plastered all over the news." (*Id.*)

### 7.    ODRC Findings

After Larrick's death in custody, a state jail inspector from Ohio's Department of Rehabilitation and Corrections ("ODRC") reviewed the incident. (*See* Doc. No. 33-2, PageID# 1425-38.)

While the investigation was pending, CO Cheri Creager ("Creager") summarized several of the inspector's concerns for Engstrom in an August 19, 2020, e-mail. (*Id.* at PageID# 1433.) First,

24

according to Creager, the inspector was concerned that Larrick's pre-screen was not filled out on paper and the intake was not done in Zuercher, the jail's booking software.  (*Id.*)  Creager noted that "[t]his is accurate," and that Larrick's pre-screen was not completed on paper.  (*Id.*)  Creager wrote that she did not know if the inspector "knows it was not done in Zuercher," but "[r]egardless, it was not done, so we do not have that documentation to provide him."  (*Id.*)  The inspector also noted to Creager that the jailhouse staff was late in their range checks, as evidenced by the shift logs and supported by the Guard1 reports.  (*Id.*)  Additionally, the inspector expressed concern that Larrick was held in booking beyond the 12-hour limit per jail standards without an "Admin Seg Form."  (*Id.*)  Creager noted that because Larrick "was in Booking longer than 12 hours, she needed an Admin Seg Form completed for being under the influence.  There was no Admin Seg Form done."  (*Id.*)  Creager also noted the following question in her e-mail to Engstrom: "If she was suspected to be under the influence, per our Intox/Detox policy, why was she not seen by Medical and a 10-minute watch started on her?"  (*Id.*)  Creager wrote that Larrick was not seen by the medical staff and no watch was ever initiated.  (*Id.*)  Finally, the inspector expressed concern about whether Larrick should have been medically cleared prior to being accepted in jail and that she was not medically cleared before coming into the facility.  (*Id.*)  Creager wrote that she did not know the answer to this because the pre-screens were not done, and that she "can only assume based on the Sheriff's relay of interviews of jail staff and Officer Kelley, the transporting officer, that she did not raise any index of suspicion that she would need medically cleared."  (*Id.*)

Ultimately, on December 18, 2020, the jail inspector notified Engstrom that the Tuscarawas County jail was out of compliance with multiple jail standards with respect to Larrick's death in custody.  (*Id.* at PageID# 1438.)  First, the jail kept Larrick in the reception area longer than 12 hours

without completing an administrative segregation form for being under the influence of drugs and alcohol. (*Id.*) Second, the jail failed to perform personal observation checks on Larrick every 60 minutes on an irregular schedule as required by Ohio's jail standards. (*Id.*) Third, the jail accepted Larrick into the facility without her first being cleared by medical or implementing the jail's own policies and procedures for intoxication/detoxification. (*Id.*) Fourth, the jail officials did not place Larrick on 10-minute checks or have her evaluated by medical staff, per policy. (*Id.*) Fifth, the jail failed to complete the required inmate pre-screen on Larrick that would have inquired about any suicidal ideation, current serious or potentially serious medical and/or mental health issues, and use of force during arrest. (*Id.*)

### 8. Dr. Dragovic's Expert Reports

In support of her Opposition to Defendants' Motion, Plaintiff submitted an expert report dated January 27, 2023, written by L.J. Dragovic, M.D. ("Dr. Dragovic"). (Doc. No. 35-1.) Dr. Dragovic has practiced forensic pathology for more than 35 years and is employed as the Chief Forensic Pathologist/Chief Medical Examiner for Oakland County, Michigan. (*Id.*) Dr. Dragovic reviewed Plaintiff's Complaint, the Guernsey County jail booking video, the Tuscarawas County Sheriff's Office Booking Medical Questionnaire, the jail incident report, the EMS and ambulance records, the Tuscarawas County Coroner's Report, including the autopsy and toxicology reports, 40 photographs of the scene of Larrick's death, 80 autopsy photographs, and 6 autopsy slides. (*Id.* at PageID# 2374-75.)

Having reviewed those materials, Dr. Dragovic concluded as follows. (*Id.*) First, he concluded that jail staff should have been on notice, based on Larrick's self-report that she consumed drugs and alcohol prior to booking, that she required close monitoring and intervention. (*Id.* at

PageID# 2376.)  Dr. Dragovic opined that the "chances for rescue of Ms. Larrick lay in close clinical monitoring from the moment of booking into Tuscarawas County Jail," and that Larrick "would have been exhibiting signs of a depressed central nervous system and medical distress that would make her seem comatose prior to her death."  (*Id.*)  He opined that this "further should have put jail staff on notice that she needed intervention."  (*Id.*)  He opined that had Larrick "undergone a drug screen or her vital signs had been closely monitored as well as the levels of her unconsciousness, or had intervention such as detoxification efforts been undertaken, Ms. Larrick's death could have been prevented." (*Id.*)  Dr. Dragovic further opined that Larrick had been dead for at least one to two hours before jail staff discovered her body at 5:12 p.m.  (*Id.* at PageID# 2376-77.)  He opined that Larrick's "death was not instantaneous, but rather a process that lasted hours, while exhibiting various stages of coma/unresponsiveness."  (*Id.* at PageID# 2377.)

Plaintiff also filed a supplemental expert report, dated March 27, 2023.  (Doc. No. 35-2.)  Dr. Dragovic prepared his brief supplemental report presumably in response to Defendants' expert report.[10]  (*Id.* at PageID# 2379 ("Upon receiving Dr. Jeffrey Springer's report of February 28, 2023 . . . .").)  Dr. Dragovic asserts three points in his supplemental report.  (*Id.*)  First, in response to Dr. Springer's observation that the written records do not indicate that Larrick showed signs of intoxication like sluggishness, incoherent speech, or other symptoms, Dr. Dragovic points out that the records contain no such symptoms because Larrick was "left unattended in the 'Detox 2 Cell' for hours before she was found dead."  (*Id.*)  Second, Dr. Dragovic refutes Dr. Springer's assertion that "the most likely source of the substances found in her system [is] the ruptured bag discovered in the large intestine."  (*Id.*)  Dr. Dragovic points out that the autopsy report clearly indicated that the bag

---

[10]  Defendants did not submit any expert reports in support of their Motion for Summary Judgment.

was "recovered from the pelvis," not the large intestine.  (*Id.*)  Third, Dr. Dragovic reiterates that Larrick "clearly indicated that she had taken drugs, upon being brought into the jail," but "[n]evertheless, she spent seventeen hours in the 'Detox 2 Cell' until her death, without any reasonable attention and/or assessment being implemented."  (*Id.* at PageID# 2379.)

### 9.    Possible Spoliation of May 9, 2019, Jailhouse Video

According to former Tuscarawas County CO Scott, the Tuscarawas County jail had surveillance cameras positioned throughout the jail.  (Doc. No. 27-9, PageID# 1226.)  These cameras allowed the COs posted in master control to view, in real time, the hallways, some housing units, and the booking area of the jail and track the movement of all individuals in the jail.  (*Id.*)  Scott believed that there were three cameras in the booking area and one camera in the sally port.  (*Id.*)

At some point, video footage of Larrick's arrival at the Tuscarawas County jail existed.  According to the record, multiple defendants viewed the video of Larrick's arrival after she died.  DiGenova logged on the supervisor shift log that he watched the video after Larrick's death.  (Doc. No. 34-5, PageID# 2341.)  The May 9, 2019, Supervisor Shift Log reads as follows: "2200 C5[11] LOOKING AT VIDEO OF (F) LARRICK FROM WHEN SHE WAS BROUGHT IN, AND UNTIL UP TO WHEN SHE WAS FOUND."  (*Id.*)  Additionally, Engstrom testified that, shortly after Larrick's death, he "saw a footage of her coming into the jail and then . . . [he] saw some other footage . . . it may have been the day she passed."  (Doc. No. 33-3, PageID# 1966.)

There is even evidence that a CO at the jail burned a physical copy of the video on a disc at Engstrom's request.  On June 26, 2020, at 12:44 p.m., Engstrom wrote the following email to shift sergeant Larry Cannon ("Cannon") and copied Campbell:

---

[11]  C5 is DiGenova's assigned officer number in all jail paperwork.  (Doc. No. 27-4, PageID# 635-36.)

> Larry,
> Ms. Larrick was "Booked In" at 0014 hours on May 9, 2019.  The date of the incident was also on May 9, 2020 [sic] at 1718 (time she was discovered).  Can you see if video is available and also who the other inmates were in Booking on that date?  If you need any other info to assist with the search, please let me or the Sheriff know.  Thanks!!!

(Doc. No. 33-4, PageID# 2075.)

Cannon responded as follows on June 27, 2020, at 6:06 p.m.:

> I am burning video now and was able to get into Jammin and get some of the names in booking on that day.  I will have printouts and a disc on your desk before I leave tonight.

(*Id.* at PageID# 2074.)

However, according to Engstrom, the video that Cannon burned for him went missing.  (Doc. No. 33-3, PageID# 2011.)  Campbell also confirmed that any video of Larrick while she was alive at the jail has since gone missing and was unable to be recovered by the jail's video surveillance company Staley Technologies.  (Doc. No. 33-1, PageID# 1388-91.)  According to Campbell, the only video of Larrick is video of her cell door with Larrick deceased inside.  (*Id.* at PageID# 1390.)

## B.  Procedural History

On May 7, 2021, Plaintiff filed her Complaint.  In her Complaint, she asserted the following claims for relief: (1) failure to provide medical care to Larrick under 42 U.S.C. § 1983, against Defendants Campbell, Border, Brown, Collins, DiGenova, Fondriest, Hamilton, Pittman, Schwab, and Scott; (2) supervisory liability under § 1983, against Defendants Campbell, DiGenova, and Hamilton; (3) *Monell* liability under § 1983, against Defendant Tuscarawas County; (4) negligence, against Defendants Campbell, Border, Brown, Collins, DiGenova, Fondriest, Hamilton, Pittman, Schwab, and Scott; (5) wrongful death pursuant to Ohio Revised Code § 2125.02, against all Defendants; and (6) survivorship action, against all Defendants.  (Doc. No. 1, ¶¶ 101-41.)

On September 7, 2021, the Court held a Case Management Conference and set case deadlines. (Doc. Nos. 14, 15.)  Four times the parties jointly moved to extend the case deadlines.  (Doc. Nos. 17, 19, 21, 22.)  After their fourth and final request, the Court set the deadline for Plaintiff's expert report as January 30, 2023, and the deadline for Defendants' expert report as February 28, 2023. (Non-Document Order dated October 31, 2022.)

On April 17, 2023, Defendants filed the instant joint Motion for Summary Judgment.  (Doc. No. 24.)  On May 24, 2023, Plaintiff filed her Opposition to Defendants' Motion, to which, on June 6, 2023, Defendants replied.  (Doc. No. 37, 38.)

On April 30, 2023, Defendants also filed a Motion to Exclude Dr. Dragovic's supplemental expert report.  (Doc. No. 28.)  On May 15, 2023, Plaintiff filed an Opposition to Defendants' Motion to Exclude.  (Doc. No. 32.)  Defendants did not file a reply in support of their Motion to Exclude.

Finally, on June 20, 2023, Plaintiff filed a Motion to Strike Defendants' New Arguments, or in the alternative, for Leave to File Surreply *Instanter*.  (Doc. No. 39.)  On July 5, 2023, Defendants filed an Opposition to Plaintiff's Motion to Strike, to which, on July 6, 2023, Plaintiff replied.  (Doc. Nos. 40, 41.)

All three motions are now ripe for decisions.

## II.    Law and Analysis

Before addressing Defendants' Motion for Summary Judgment, the Court will first consider Defendants' Motion to Exclude Expert Opinions and Report and Plaintiff's Motion to Strike Defendants' New Arguments.  (Doc. Nos. 28, 39.)

30

A.      **Defendants' Motion to Exclude Expert Opinions and Report**

Defendants argue that Dr. Dragovic's rebuttal expert report is untimely and "should be excluded from evidence."  (Doc. No. 28, PageID# 1313.)  Plaintiff responds that the rebuttal report is not untimely because the Court did not set a rebuttal deadline.  (Doc. No. 39, PageID# 1321-22.)  And even if the report is untimely, Plaintiff's late disclosure is substantially justified and harmless under Rule 37(c)(1).  (*Id*. at PageID# 1322.)

The Court set a deadline for each party's respective expert report, but it did not set a deadline for any rebuttal expert report.  (*See* Non-Document Order dated October 31, 2022.)  Rule 26(a)(2)(D) specifies when a party must make expert disclosures.  It provides, in relevant part:

> Absent a stipulation or a court order, [expert report] disclosures must be made:
> (i) at least 90 days before the date set for trial or for the case to be ready for trial; or
> (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

Fed. R. Civ. P. 26(a)(2)(D).  Plaintiff argues that subsection (ii) does not replace (i), meaning that "even if there were less than 90 days left before trial, the party seeking to rebut expert testimony would still be entitled to have at least 30 days to produce rebuttal opinions."  (Doc. No. 39, PageID# 1322.)  Plaintiff submits that her rebuttal report was timely because the trial date has not been set.  The Court disagrees.  The plain language of Rule 26(a)(2)(d)(ii) requires rebuttal expert reports "within 30 days after the other party's disclosure."  *See Bentley v. Highlands Hosp. Corp.*, 2016 U.S. Dist. LEXIS 139414 at *10-11 (E.D. Ky. Oct. 6, 2016) (Thapar, J.) ("Rebuttal reports, meanwhile, are ordinarily due thirty days after the other party's disclosure.").

Defendants submitted their expert report on February 28, 2023 (Doc. No. 28, PageID# 1313), so any rebuttal report was due 30 days thereafter, or March 30, 2023.  Fed. R. Civ. P. 26(a)(2)(D)(ii);

*see also Lincoln Elec. Co. v. Travelers Cas. & Sur. Co.*, 2013 U.S. Dist. LEXIS 194871 at *3 (N.D. Ohio June 26, 2013) ("[C]ourts in this Circuit have uniformly concluded that when, as here, a scheduling order does not address rebuttal reports, Rule 26(a)(2)(D)'s 30-day rule applies."). Because Plaintiff served her rebuttal report on April 3, 2023—four days after the deadline—Plaintiff's disclosure was untimely.

If a party does not timely disclose a rebuttal expert report, "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing or at trial." Fed. R. Civ. P. 37(c)(1). The only exception is if the failure to timely disclose is "substantially justified or is harmless." *Id*.

The Sixth Circuit has adopted five factors for a court to evaluate in determining whether an untimely disclosure is substantially justified or harmless:

> (1) the surprise to the party against whom the evidence would be offered;
> (2) the ability of that party to cure the surprise;
> (3) the extent to which allowing the evidence would disrupt the trial;
> (4) the importance of the evidence; and
> (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (citation omitted). This Court has "broad discretion in applying these factors and need not apply each one rigidly." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019) (quoting *Bentley*, 2016 U.S. Dist. LEXIS 139414 at *30). Their purpose is to "separat[e] 'honest,' harmless mistakes from the type of 'underhanded gamesmanship' that warrants the harsh remedy of exclusion." *Id*. The burden is on Plaintiff to prove that her untimely disclosure was justified or harmless. *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 272 (6th Cir. 2010).

The Court first considers the surprise to Defendants. Dr. Dragovic's rebuttal report does not add any new theories or expand on any of his opinions. Rather, he provides two concise comments

32

on the lack of evidence supporting the Defendants' expert's assertions that Larrick did not show signs of intoxication and the likely source of the drugs in her system was the ruptured bag found in her body.  (Doc. No. 35-2, PageID# 2378-79.)  As Defendants were aware of their own expert's report, Dr. Dragovic's short rebuttal of it cannot be a surprise to Defendants.  *C.f. Bentley*, 2016 U.S. Dist. LEXIS 139414 at *30-31 (finding surprise where supplemental report added a new theory of liability and expanded an opinion).  Therefore, this factor weighs in Plaintiff's favor.

The second and third factors also weigh in Plaintiffs' favor.  Even if the rebuttal report was a surprise to Defendants, they had time to consider it before filing their Motion for Summary Judgment. Defendants also could have submitted their own rebuttal to Dr. Dragovic's report, but they chose not to.  And, as the Court has yet to set a date for trial, Defendants have ample time to prepare to cross-examine Dr. Dragovic about his rebuttal report.  *See EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, 768 F. App'x 459, 469 (6th Cir. 2019) ("the ability to cross-examine witnesses about late disclosures during trial both provide[s] an opportunity to remedy surprise and minimize[s] impact on the trial").

The fourth factor—the importance of the evidence—is neutral.  As noted above, the rebuttal report is nothing more than two concise comments on the lack of evidence supporting the opposing experts' assertions.  The rebuttal adds no evidence, and what it may arguably add is of little importance.  Whether the Court allows or excludes the untimely rebuttal will have no crucial or important impact on this case.

The fifth and final factor is also neutral.  Plaintiff offers no explanation for her untimely disclosure.  But the Court notes that Plaintiff's rebuttal report was late by only four days.  Such tardiness is more indicative of "negligence, confusion, and lack of information" rather than the "underhanded gamesmanship" that warrants exclusion.  *Howe*, 801 F.3d at 747, 749; *see also Sommer*

*v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003) (concluding that an expert disclosure over seven months after the deadline was not an honest mistake).

Three factors weigh against excluding Dr. Dragovic's rebuttal report and two factors are neutral. Accordingly, the Court denies Defendants' Motion to Exclude Dr. Dragovic's rebuttal report.

### B.    Plaintiff's Motion to Strike

Plaintiff contends that Defendants raised issues with Dr. Dragovic's opinions for the first time in their Reply and that these new arguments should be stricken. (Doc. No. 39, PageID# 2514.) Defendants respond that they raised no new arguments but merely commented on Dr. Dragovic's statements. (Doc. No. 40, Page ID# 2527.)

Courts "will generally not hear issues raised for the first time in a reply brief." *United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001). If a party raises an argument for the first time in its reply brief, the party has waived the argument. *Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588, 595 n.4 (6th Cir. 2008) (citing *Renkel v. United States*, 456 F.3d 640, 642 n.1 (6th Cir. 2006)); *see also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). The Federal Rules of Civil Procedure do not expressly permit surreplies, but they "may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. TVA*, 339 F.3d 454, 481 (6th Cir. 2003)).

Plaintiff's Opposition to Defendants' Motion for Summary Judgment contains at least 13 citations to Dr. Dragovic's expert report. (Doc. No. 37, PageID# 2458, 2463-65, 2467-68, 2478.) These citations are to support Plaintiff's arguments about Larrick's "unresponsiveness," "depressed central nervous system," "comatose" state, time of death, and cause of death. (*Id*.) Defendants argue

34

in their Reply that the Court should disregard Dr. Dragovic's opinions because they either lack evidentiary support or are outside the scope of his expertise.  (Doc. No. 38, PageID# 2489-90.) Plaintiff contends that "[t]his argument is found nowhere in [Defendants'] Motion for Summary Judgment" and the Court should strike it.  (Doc. No. 39, PageID# 2514.)  True, Defendants did not make this argument in their Motion for Summary Judgment.  But a party can "respond to arguments raised for the first time in [the opposing party]'s brief."  *Lee v. Werner Enters., Inc.*, 2022 U.S. Dist. LEXIS 200848 at *5-6 (N.D. Ohio Nov. 3, 2022) (quoting *Crozier*, 259 F.3d at 517).  This is because "reply briefs *reply* to arguments made in the response brief."  *Id.* at *6 (quoting *Scottsdale Ins. Co.*, 513 F.3d at 553).

Because Defendants did not raise a new issue in their Reply, but rather responded to Plaintiff's arguments that cited to Dr. Dragovic's report, the Court denies Plaintiff's Motion to Strike and For Leave to File a Surreply.

### C.    Motion for Summary Judgment

The Court now turns to Defendants' Motion for Summary Judgment.  (Doc. No. 24.)  As an initial matter, the Court addresses which Defendants remain in this case.  In Plaintiff's Opposition, she indicates that she "does not oppose Defendants' Motion in regard to Defendants Caden Brown, Daniel Border, Julie Scott, and Vonda Hamilton."  (Doc. No. 37, PageID# 2471.)  Accordingly, the Court grants summary judgment to Defendants Brown, Border, Scott, and Hamilton as to all Plaintiff's claims against them and dismisses these defendants from this case.  Thus, the only remaining defendants in this case are Tuscarawas County, Campbell, Pittman, Collins, DiGenova, Schwab, and Fondriest.

### 1.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*,

36

593 F. App'x at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

### a)   Spoliation and Adverse Inference

In her Opposition to Defendants' Motion for Summary Judgment, Plaintiff argues that Defendants destroyed video footage of Larrick in the jail booking area, which amounts to spoliation of evidence. (Doc. No. 37, PageID# 2468.) She asks the Court to sanction Defendants with an adverse inference instruction to the jury that Larrick "was visibly intoxicated from the moment she arrived at the [Tuscarawas County jail], that she was in obvious need of medical care, and was visibly deteriorating until her death." (*Id.* at PageID# 2470.) Defendant's response is that "the video is 'taped over' every forty days, . . . [and] [t]he plaintiff developed no contrary evidence to suggest foul play." (Doc. No. 38, PageID# 2494.) For the following reasons, the Court finds that an adverse inference is not warranted.

Generally, a party seeking spoliation sanctions must establish:

(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claims or defenses such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (citation and internal quotation marks omitted). However, effective December 1, 2015, the Supreme Court amended Rule 37(e).

While neither party cites it, Rule 37 specifically addresses a party's failure to preserve electronically stored information.[12]  Rule 37(e) provides, in relevant part:

> Failure to Preserve Electronically Stored Information.  If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;
>
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

Since Plaintiff seeks an adverse inference instruction to the jury, she must show that Defendants had "intent to deprive" her of the video's use in this litigation.  Fed. R. Civ. P. 37(e)(2)(B).  The Sixth Circuit has explained:

> It bears adding that to the extent [the plaintiff] sought an adverse inference instruction for spoliation of electronic information, a 2015 amendment to Civil Rule 37(e)(2) required her to show that [the defendant] had "intent" to deprive her of the information's use.  A showing of negligence or even gross negligence will not do the trick.

*Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) (citing Fed. R. Civ. P. 37, 2015 Advisory Comm. Note).

Plaintiff deposed Engstrom, the administrator of the Tuscarawas County jail.  (Doc. No. 33-3.)  As to the lost video, he testified as follows:

> Q.  I understand that there are cameras in the booking area, right?
> A.  Yes, ma'am.

---

[12]  Electronically stored information is "[d]ata created, manipulated, communicated, stored, and best used in digital form using computers."  ELECTRONICALLY STORED INFORMATION, Black's Law Dictionary (11th ed. 2019); *see also* Fed. R. Civ. P. 34, 2006 Advisory Comm. Note) (electronically stored information "is expansive and includes any type of information stored electronically").  As the video was created in digital form, stored on a server, and later copied to a compact disc, it meets the definition of electronically stored information.

Q.  Are those running 24/7?

A.  Yes, ma'am.

Q.  In 2019, were those running 24/7?

A.  I believe so.

Q.  How are they maintained—I'm sorry, how is the recordings—how are the recordings maintained?

A.  There's a—there's hardware.  There's a server upstairs that they're all kept, and I believe it's for 30 to 40 days.  And then they're recorded over.

Q.  On the server space?

A.  Yes.

. . .

Q.  Have you ever seen any video footage in relation to Megan Larrick?

A.  Yes.

Q.  What footage did you review?

A.  I saw a footage of her coming into the jail, and then—I'm trying to think of the other.  I saw some other footage.  I—it may have been the day she passed.  I can't recall for sure.

Q.  When did you watch that?

A.  It would have been at the time of—shortly after Megan's death, somewhere in that time period.

Q.  Did you ever see any footage of her in her cell while she was alive?

A.  No.

Q.  Are you certain that it was a video footage of her coming into this jail that you reviewed?

A.  Uh-huh.

Q.  Is that a yes, for the record?

A.  Yes.  I'm sorry.

Q.  Okay.  Do you know if that video footage was preserved?

A.  I do not.

. . .

Q.  Okay.  All right.  On the footage that you reviewed of Megan coming into the jail—I know it's been a long time since you reviewed that, right?

A.  Three years or so.

Q.  Yeah.  Do you recall anything from that video?

A.  Just that she was chatting as—and there was no audio.  That she was talking when she came in, and she was maneuvering fine, and she didn't appear to be under the influence of anything at that time.  Just, again, I'm looking at it on video.  I have no audio.

. . .

Q.  All right.  So you sent Larry Cannon an e-mail on June 26th of 2020 asking for video and list of other inmates who were in booking on that date.  And then he responded and said, I'm burning a disk, and I'll leave it on your desk.  Do you recall that?

39

A. Yeah. He was able to—and I can't remember if our internal investigators wanted to know what other inmates were there or if ODRC did, but Larry was able to look at video and determine who all was there at the time.

Q. Okay.

A. I can't remember what else was on the video.

Q. Okay. Do you know what happened to that disk?

A. I do not.

Q. Do you know if you still have it somewhere?

A. I do not, but I'll look.

Q. Okay.

A. But I went through everything. I even had Staley Technologies search my computer to make sure that I wasn't missing anything, but they couldn't find it. And then I had them search Sergeant Goss' computer because it's the same computer that Sergeant Creager had, and we couldn't find any additional videos.

Q. When did you ask Staley Technologies to do those searches?

A. I don't know. It's probably a year ago or maybe not quite that long.

Q. And why did you do that?

A. Because I wanted to make sure there wasn't any videos out there, because I think— I felt—no offense, I felt the video of her coming in helped us and the decision-making process that Mr. Pittman made.

(*Id*. at PageID# 1966-67, 1969, 2011-12.)

Based on this testimony, the Court finds as follows. First, Engstrom had Staley Technologies search for the video "probably a year ago or maybe not quite that long." (Doc. No. 33-3, PageID# 2012.) Engstrom's deposition was taken on August 9, 2022. So, no earlier than August 9, 2021, Engstrom "lost" the video—or at least failed to find it. Plaintiff filed this case on May 7, 2021, and all Defendants waived service by the end of June 2021. (Doc. Nos. 1, 3, 5, 6.) Therefore, at the time Engstrom lost and/or failed to find the video, he was aware of the lawsuit against Defendants. *C.f. Applebaum*, 831 F.3d at 745 (suggesting that the plaintiff's motion for an adverse inference instruction for spoliation would have failed because she could not show the defendant destroyed the records "after it was put on notice of litigation"). Second, Engstrom lost the video with no explanation as to how or why it was lost. As such, he failed to take any reasonable steps to preserve the video. Third, since Staley Technologies' search for the video was unsuccessful, the video cannot be restored

40

or replaced.  Fourth, Engstrom's testimony that the video helped Defendants shows that the video was relevant to Plaintiff's claims in this case.

To impose the sanction that Plaintiff requests under Rule 37(e)(2), the Court must also find that Defendants intended to deprive Plaintiff of the use of the video.  To reiterate: "[n]egligent or even grossly negligent behavior" is not enough for an inference "that the lost information was unfavorable to the party who lost it."  Fed. R. Civ. P. 37, 2015 Advisory Comm. Note; *see also Applebaum*, 831 F.3d at 745.  This standard applies not only at trial, but also "when ruling on a pretrial motion," such as a motion for summary judgment.  Fed. R. Civ. P. 37, 2015 Advisory Comm. Note; *see also DriveTime Car Sales Co., LLC v. Pettigrew*, 2019 U.S. Dist. LEXIS 66339 at *11 (S.D. Ohio Apr. 18, 2019).  Based on the record before it, the Court finds that Engstrom was at least negligent in losing the video.  He was arguably even grossly negligent.  Engstrom testified that he "wanted to make sure there wasn't any videos out there" because he "felt the video of her coming in helped us." (Doc. No. 33-2, PageID# 2012.)  Whether the video actually helped Defendants or not, we will ever know.  But the available evidence is insufficient to establish that Engstrom lost the video because he intended to deprive Plaintiff of its use.

Accordingly, for purposes of Defendants' Motion for Summary Judgment, the Court will not "presume that [the video] was unfavorable to [Defendants]" under Rule 37(e)(2)(A).  This does not prohibit Plaintiff, however, from moving for a lesser sanction under Rule 37(e)(1), such as "present[ing] evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision."  *See* Fed. R. Civ. P. 37, 2015 Advisory Comm. Note.

41

### b)      Method of Death

Before addressing Defendants' Motion for Summary Judgment, the Court must first consider how Larrick died.  The parties agree that Larrick's *cause* of death was acute fentanyl, acetyl fentanyl, cocaine, and methamphetamine toxicity.  (*See* Doc. No. 24, PageID# 118; Doc. No. 37, PageID# 2465.)  They disagree, however, about Larrick's *method* of death.  Defendants repeatedly assert that Larrick died due to the absorption of the drugs suspected to be in the baggie found in her body.  (*See, e.g.,* Doc. No. 24, PageID# 119.)  Plaintiff, meanwhile, contends that it is in dispute (a) whether the baggie "was open before the coroner cut it," (b) whether the baggie even contained drugs, and (c) where the baggie was found.  (Doc. No. 37, PageID# 2466-67.)

At this stage, the Court's task is to "view[] the evidence in the light most favorable to" Plaintiff, *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017) (citation omitted), and to "draw[] all justifiable inferences" in her favor, *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs*, 974 F.3d 652, 660 (6th Cir. 2020) (citation and internal quotation marks omitted).  At the same time, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," when ruling on a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

These guiding legal principles dictate the following conclusions.

First, there is no evidence that the "apparent tan material" in the baggie was ever tested.  (Doc. No. 24-21, PageID# 264.)  So, Defendants' assertion that the baggie "contain[ed] a mixture of illegal drugs—methamphetamine, acetyl fentanyl, fentanyl, and cocaine"[13] is in genuine dispute.  Without

---

[13]  Defendants do not provide any citation(s) to the record for this assertion.

any evidence that the baggie contained drugs, the Court will infer—for purposes of summary judgment—that it did not.

Second, while the medical examiner noted that the baggie was "undone along approximately one-third of the length of the seal," he also recognized that "[t]he bag has some full-thickness cuts in it, which were possibly made during evisceration." (Doc. No. 24-21, PageID# 264.)  So, Defendants' assertion that Larrick "died as a result of her failure to properly seal the zip lock or as the result of the natural peristalsis and segmentation processes of the digestive system causing the baggie to unseal"[14] is, again, in genuine dispute.  (Doc. No. 24, PageID# 121.)  For purposes of summary judgment, the Court will infer that the baggie was cut open during the autopsy rather than that it opened through "peristalsis" as Defendants argue.

Lastly, the medical examiner wrote that "following evisceration of the intestines," he recovered a baggie "from the pelvis." (Doc. No. 24-21, PageID# 264.)  It is unclear from the autopsy report whether the medical examiner found the baggie in Larrick's intestines or elsewhere in her pelvic region.  The location of the baggie in Larrick's body is therefore also in genuine dispute.

In sum, the Court infers from the summary judgment record that Larrick's method of death was not the suspected drugs from the baggie found in her body, but the drugs already in her system prior to her arrest.  The Court now turns first to Plaintiff's deliberate indifference claim.

### 2.    Count One: Deliberate Indifference to Medical Need

In Count One, Plaintiff alleges that Defendants Pittman, Collins, DiGenova, Schwab, Fondriest, and Campbell were deliberately indifferent to Larrick's serious medical need in violation of Larrick's constitutional rights.  (Doc. No. 1, ¶¶ 101-07.)

---

[14]  Defendants do not provide any citation(s) to the record for this assertion.

Courts in the Sixth Circuit used to analyze both pretrial detainees' and prisoners' deliberate indifference claims "under the same rubric." *Brawner v. Scot Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021). A deliberate indifference claim has both an objective and a subjective component. *Id*. at 591. The Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), led the Sixth Circuit to modify the subjective component of the deliberate indifference test for pretrial detainees. *Brawner*, 14 F.4th 596. After some disagreement over how *Brawner* modified the test, *see Trozzi v. Lake Cty.*, 29 F.4th 745, 753 (6th Cir. 2022), the court in *Helphenstine v. Lewis Cty.*, 60 F.4th 305 (6th Cir. 2023), held as follows:

> [P]laintiff must show (1) that [the pretrial detainee] had a sufficiently serious medical need and (2) that each defendant "acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."

*Id*. at 317 (quoting *Brawner*, 14 F.4th at 596).

### a)    The Objective Prong

Defendants argue that Larrick did not have an objectively serious medical need. (Doc. No. 24, PageID# 121.) Their argument is premised on the assumption that Larrick died because of the suspected drugs in the baggie. (*Id*.) And since Defendants were not aware that Larrick had the baggie in her system, they could not recognize she needed medical attention. (*Id*. at PageID# 123.)

Plaintiff responds that Defendants fail to address that this prong is objective. (Doc. No. 37, PageID# 2472.) She argues that "[b]ecause [Larrick] was suffering and died from polysubstance intoxication . . . there is no question that her condition was sufficiently serious." (*Id*.)

Defendants conflate the objective and subjective prongs of the deliberate indifference test. Larrick died from acute methamphetamine, fentanyl, acetyl fentanyl, and cocaine toxicity. (Doc. No. 24-21, PageID# 261.) The Sixth Circuit has "routinely held that a condition resulting in death is

44

'sufficiently serious' to meet the objective component." *Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021) (citing *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018); *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014); *Speers v. Cty. of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)).  This prong is met.

### b)    The Subjective Prong

The subjective prong of the test focuses on whether Defendants knew or should have known of the unjustifiably high risk of harm that Larrick's serious medical need posed, and whether they acted deliberately and recklessly in the face of it.  *Helphenstine*, 60 F.4th at 305.  Under the subjective prong, the Court must individually evaluate each Defendant.  *Greene v. Crawford Cty.*, 22 F.4th 593, 607 (6th Cir. 2022).  The Court will analyze Defendants in the order they interacted with Larrick, starting with Pittman.  For the following reasons, the Court concludes that there are genuine issues of material fact as to whether Defendants Pittman and Schwab acted with deliberate indifference to Larrick's serious medical need.

### (1)    John Pittman

Pittman was the booking officer the night Larrick arrived at the Tuscarawas County jail.  (Doc. No. 27-6, PageID# 873.)  Pittman spoke with the officer that transported Larrick to the jail, Kelley, because Kelley "might have heard something or talked to [Larrick]," which could raise a "red flag" for Pittman during the intake process.  (*Id*. at PageID# 876.)  Kelley told Pittman that Larrick said she "had done drugs and alcohol that night."  (*Id*. at PageID# 879.)

Pittman started the booking process for Larrick, but he never completed it.  (*Id*. at PageID# 882.)  He never asked Larrick the medical questions he was required to ask her.  (*Id.* at PageID# 883.)  By his own admission, he did just enough to get her a jail identification number but decided that he

would finish her booking process when he could get around to it.  (*Id.* at PageID# 877, 882.)  While Pittman's "failure to follow internal policies, without more, [does not] constitute deliberate indifference," his failure to properly book Larrick must be considered in light of what he observed during the remainder of his shift. *Griffith v. Franklin Cty.*, 975 F.3d 554, 579 (6th Cir. 2020) (citation omitted).

One of Pittman's duties was to conduct a range check on Larrick every 60 minutes.  (*Id.* at PageID# 883.)  He testified that when he checked on her, she always "appeared to be sleeping . . . or laying down," and that he "never heard a peep out of her."  (*Id.* at PageID# 916.)

At 5:44 a.m., Pittman brought Larrick breakfast.  (*Id.* at PageID# 900.)  She did not eat.  (*Id.*)  Pittman testified that her not waking up for breakfast was a "red flag."  (*Id.* at PageID# 902.)  In his incident report, Pittman wrote that he yelled into Larrick's cell to ask if she wanted her breakfast, and she grunted and turned her head the other way.  (Doc. No. 34-4, PageID# 2293.)

During his last range check at 6:31 a.m., Pittman noticed another "red flag."  (Doc. No. 27-6, PageID# 902.)  When he checked in on Larrick, he saw that she was lying down "strangely."  (*Id.*)  He thought that "somebody shouldn't be laying like that."  (*Id.*)  In his incident report, Pittman explained that "her feet were crossed in a weird way."  (Doc. No. 34-4, PageID# 2293.)  He could not tell if she was breathing, so he opened the cell and yelled her name.  (*Id.*)  Larrick grunted and fell back asleep.  (*Id.*)  In Pittman's mind, he "got a response" and her "chest was rising and falling," so "everything [was] kosher."  (Doc. No. 27-6, PageID# 901.)

Brianna Schwab relieved Pittman at the end of his shift.  (*Id.* at PageID# 903.)  While Pittman did not remember exactly what he told Schwab, he testified that he would have said "you just need to finish her book-in, medical questions, [and] have her sign the paperwork."  (*Id.* at PageID# 889.)

46

He would also have passed down that Larrick "had done some drugs and alcohol before she got picked up.  She appeared to have been sleeping. . . .  [S]he skipped breakfast."  (*Id*. at PageID# 890.)

Pittman knew Larrick used drugs and alcohol before her arrest.  He also saw her sleeping for nearly his entire shift.  Most importantly, he observed what he described as two "red flags."  First, it was a "red flag" that Larrick did not eat breakfast.  And second, it was a "red flag" that Larrick was lying in a strange way.  In response to both "red flags," Pittman did no more than yell Larrick's name into her cell and wait for some minimal sign of life.

In *Helphenstine*, a jailer knew that the detainee was "dope sick" and had vomited once.  60 F.4th at 317.  The jailer also recognized that someone should notify the medical staff, but he never did so himself and he did not ask anyone else to do so.  *Id*.  On these facts, the Sixth Circuit concluded that a "reasonable jury could find that [the jailer] acted with deliberate indifference."  In this case, Larrick never vomited.  But the fact that the detainee vomited in *Helphenstine* was important because "[v]omiting is 'a clear manifestation of internal physical disorder.'"  *Id*. at 318 (quoting *Blackmore v. Kalamazoo Cnty.,* 390 F.3d 890, 899 (6th Cir. 2004)).  Similarly, although Pittman did not see Larrick vomit, he did observe other "red flags" that were manifestations of something internally wrong with Larrick.

Because Pittman knew Larrick reported using drugs and alcohol, and he personally observed Larrick exhibit "red flags" as a likely result of that drug use, a reasonable jury could conclude that Pittman knew or should have known that Larrick needed medical care.  And since Pittman did nothing in response to that need beyond yelling Larrick's name, a reasonable jury could also conclude that Pittman recklessly disregarded this risk to Larrick's health.  As the Sixth Circuit recognized in *Greene v. Crawford Cty.*, 22 F.4th 593 (6th Cir. 2022), "[a]t a certain point, bare minimum observation ceases

to be constitutionally adequate.  At what point that occurred in this case will be for the jury to determine."  *Id*. at 609.  Accordingly, the Court denies summary judgment as to Pittman.

### (2)  Marianne Collins

Collins was working in master control the night Larrick arrived at the jail.  (Doc. No. 27-5, PageID# 750.)  She was in the booking area when Larrick came in.  (*Id*.)  Kelley, the officer who brought Larrick to the jail, told Collins that he suspected Larrick had drugs on her.  (*Id*. at PageID# 749.)  So, Collins brought Larrick to the shower, checked her for drugs, and sprayed her down.  (*Id*. at PageID# 750.)  During this, Larrick disclosed that she used drugs before her arrest.  (*Id*.)  After the shower, Collins gave Larrick clothes and put her in a cell.  (*Id*. at PageID# 756.)  Collins then went back to master control.  (*Id*.)  Collins did not see Larrick again during the rest of her shift.  (*Id*. at PageID# 761.)

Collins's interactions with Larrick were relatively limited.  She knew Larrick had been using drugs, but she was not responsible for monitoring Larrick.  On these facts, no reasonable jury could find that Collins recklessly disregarded a risk to Larrick's health.

### (3)  Dave DiGenova

Plaintiff has sued DiGenova in both his individual and supervisory capacities.  The Court addresses his liability under a supervisory theory in part II.C.3, below.  DiGenova was the shift supervisor the night Larrick arrived at the jail.  (Doc. No. 27-4, PageID# 589.)  DiGenova went down to the booking area when he was notified Larrick was being brought in.  (Doc. No. 27-4, PageID# 619.)  He said hello to Kelley and saw Larrick.  (*Id*. at PageID# 620, 629.)  When Collins led Larrick to the shower, DiGenova left the booking area.  (*Id*. at PageID# 630.)  Neither Pittman nor Collins ever told DiGenova that Larrick needed medical attention.  (*Id*. at PageID# 622.)  On this sparse

48

Case: 5:21-cv-00959-PAB  Doc #: 42  Filed: 09/28/23  49 of 64.  PageID #: 2581

evidence, no reasonable jury could find that DiGenova was deliberately indifferent to Larrick's medical needs in his individual capacity.

### (4)    BrieAnna Schwab

Schwab took over from Pittman as the dayshift booking officer.  At the start of her shift, "whoever was in booking the night before"[15] told Schwab that Larrick "refused her breakfast tray" and "might have done [or been on] drugs."  (Doc. No. 27-1, PageID# 321, 347.)  The jail's medical staff came to the booking area at the start of Schwab's shift, but Schwab did not mention anything about Larrick to them.  (*Id*. at PageID# 322.)  Nor did Schwab complete Larrick's booking.  (*Id*. at PageID# 336.)  Schwab testified she did not do so because Larrick was sleeping.  (*Id*. at PageID# 337.)  Again, while Schwab's failure to follow the jail's policies does not alone constitute deliberate indifference, it must be considered in light of what she observed next.  *C.f. Howell v. NaphCare, Inc.*, 67 F.4th 302, 315 (6th Cir. 2023) (concluding that where defendant checked on detainee every 90 minutes rather than every 15 minutes as policy required, the record lacked "something 'more'" to push defendant's conduct from negligence to deliberate indifference).

Larrick was sleeping at the start of Schwab's shift, and may have slept through all of it, though Schwab testified she was not sure.  (*Id*. at PageID# 338.)  In any case, Schwab thought that as long as she checked on Larrick and made sure "she was okay and breathing" then, in her mind, "everything was okay."  (*Id*. at PageID# 338-39.)  At some point during the day, Schwab asked Larrick if she was "okay", and Larrick said she was "fine."  (*Id*. at PageID# 323.)  Schwab also testified that at some point she heard the toilet flush and the water fountain run, but she could not say when.  (*Id*.)  She also

---

[15] Schwab did not remember if it was Pittman that told her this information.  (Doc. No. 27, PageID# 321.)

49

testified that she saw Larrick lying in different positions throughout the day.  (*Id*. at PageID# 324.)

Schwab saw this while walking by her cell and peering in.  (*Id*. at PageID# 324-25.)

Schwab served Larrick lunch, but again Larrick refused her food.  (*Id*. at PageID# 325.)

Schwab testified that Larrick "slightly sat up from the laying down position," shrugged, and shook

her head no.  (*Id*. at PageID# 326.)  Schwab knew at this point that Larrick also refused breakfast.

(*Id*.)  After lunch, at 1:17 p.m., Schwab checked on Larrick.  (Doc. No. 34-1, PageID# 2273.)  She

wrote in her incident report that she saw Larrick breathing at this time.  (*Id*.)  Initially, Schwab

testified that she saw Larrick again at 1:52 p.m. while moving another detainee, and that she observed

Larrick breathing.  (Doc. No. 27-1, PageID# 351-52.)  But later she testified that she just "heard

[Larrick] move."  (*Id*. at PageID# 355.)

Schwab saw Larrick again between 2:00 p.m. and 4:45 p.m. while doing her rounds.  (*Id*. at

PageID# 356.)  She did not know how many times she saw Larrick nor whether she saw Larrick

moving during this time.  (*Id*. at PageID# 337.)  Plaintiff's expert opines that Larrick died between

3:12 p.m. and 4:12 p.m. and that her death was "a process that lasted hours." (Doc. No. 35-1, PageID#

2376.)  So, Schwab saw Larrick while she was dying or dead at least once, and, perhaps, multiple

times.

At around 4:45 p.m., Schwab served Larrick dinner.  (*Id*. at PageID# 356.)  She saw Larrick

lying face down.  (*Id*. at PageID# 358.)  She did not know how long Larrick was lying like that.  (*Id*.)

She returned to Larrick's cell at 5:12 p.m. and noticed Larrick had not touched her food.  (*Id*.)  Schwab

opened Larrick's cell and called her name.  (*Id*.)  Larrick did not respond.  (*Id*.)  Schwab then entered

Larrick's cell, touched her shoulder, and realized she was dead.  (*Id*. at PageID# 358-59.)

Schwab started her shift knowing that Larrick "might have" done drugs, had refused breakfast, and, according to Pittman, had slept through most of Pittman's shift.  Once on duty, Schwab observed Larrick continue to sleep, refuse another meal, and rarely move.  Schwab may have once asked Larrick if she was okay, but otherwise her observation was limited to looking at Larrick through the cell door to make sure she was still breathing.  During at least one of these checks, Schwab observed Larrick while she was dying or already dead.  It was not until 5:12 p.m. that Schwab entered Larrick's cell.  But at this point, it was too late, and Larrick was dead and cold to the touch.

In *Smith v. Cty. of Lenawee*, 505 F. App'x 526 (6th Cir. 2012), the Sixth Circuit denied qualified immunity to a defendant that "encountered [the detainee] in her last hour, at a time when she was unresponsive and sweating profusely.  He was on notice that she was very ill and yet did nothing to make sure that [the detainee] had not taken a turn for the worse."  *Id*. at 535.  Similarly, Schwab knew Larrick had used drugs, refused two meals, and slept during the majority of the last fifteen hours she was at the jail.  Yet she did nothing more than peer into Larrick's cell to see if she was breathing—until, that is, she entered Larrick's cell and found her dead.

On these facts, similar to Pittman, a reasonable jury could find that Schwab should have known that Larrick was in medical need.  A reasonable jury could also find that Schwab's "bare minimum observation" of Larrick amounted to reckless disregard.  *Greene*, 22 F.4th at 609.  Accordingly, the Court denies summary judgment as to Schwab.

### (5)    Cruz Fondriest

Fondriest was the rover during the day shift when Larrick died.  (Doc. No. 27-7, PageID# 997.)  Sometime between 10:50 p.m. and 11:20 p.m., Fondriest asked Larrick if she wanted her lunch.  (*Id*. at PageID# 1007.)  He recognized at this point that Larrick looked to be in withdrawal because

she was sleeping a lot. (*Id*. at PageID# 1008.) He decided to "let [her] be" and to "give [her] [her] space." (*Id*. at PageID# 1008-09.) Other than this one interaction, Fondriest never spoke with Larrick or entered her cell. (*Id*. at PageID# 1014.)

While Fondriest "assumed that [Larrick] was withdrawing" (*id*. at PageID# 1010), unlike Pittman and Schwab, he did not know that Larrick had disclosed using drugs before her arrest. Additionally, while Fondriest recognized that "there's no way [Larrick] went without being looked at" between 2:18 p.m. and 4:31 p.m. (*id*. at PageID# 1006-07), he—unlike Schwab—never testified that he saw Larrick during this time.

In *Helphenstine*, the Sixth Circuit affirmed the district court's grant of summary judgment as to two defendants. 60 F.4th at 321. One defendant briefly walked the detainee to the courthouse where he informed the judge that the detainee was incoherent and "had '[s]tuff coming out of his mouth." *Id*. The other defendant observed the detainee twice—once when the detainee told the defendant he was never going to drink whiskey again, and a second time when the defendant brought the detainee something to drink. *Id*. The court concluded that while both defendants "knew that [the detainee] was going through withdrawal, that knowledge alone did not require either of them to seek medical care for [the detainee]." *Id*. Similarly, Fondriest assumed Larrick was going through withdrawal, but his interactions with Larrick were brief and gave him no "reason to appreciate the seriousness of [Larrick's] condition." *Id*. (citing *Speers v. Cty. of Berrien*, 196 F. App'x 390, 396 (6th Cir. 2006)). And even if Fondriest should have initiated the jail's intoxication and detoxification policy as Plaintiff argues (Doc. No. 37, PageID# 2478), his failure to do so is at most negligence and "does not give rise to a deliberate indifference claim." *Helphenstine*, 60 F.4th at 322 (citing *Griffith*, 975 F.3d at 578).

52

Accordingly, the Court grants summary judgment as to Fondriest.

### (6)    Orvis Campbell

Plaintiff sued Campbell in both his individual and supervisory capacities.  His liability under a supervisory theory is addressed in part II.C.3., below.  As for his individual liability, Plaintiff does not address it in her Opposition, even though Campbell moved for summary judgment in his favor as to his individual liability.  (Doc. No. 24, PageID# 130-31.)  The Sixth Circuit has recognized that "[its] jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."  *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Wierengo v. Akal Sec., Inc.*, 580 F. App'x 364, 369 n.1 (6th Cir. 2014) ("Akal moved for summary judgment on Wierengo's federal- and state-law claims.  Wierengo did not discuss her state-law claims in her response brief, and the district court held that they were abandoned.  We agree."); *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because Hicks failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief.").

Accordingly, the Court finds that Plaintiff has abandoned her federal claim against Campbell in his individual capacity.

### 3.    Count Two: Supervisory Liability

In Count Two, Plaintiff alleges that Defendants Campbell and DiGenova were deliberately indifferent to Larrick's serious medical need in their supervisory capacities.  (Doc. No. 1, ¶¶ 108-13.) Defendants move for summary judgment on this Count arguing that neither Campbell nor DiGenova

"encouraged [a] specific incident of misconduct or in some other way directly participated in it." (Doc. No. 24, PageID# 131.)

"To succeed on a supervisory liability claim, a plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Helphenstine*, 60 F.4th at 321 (quoting *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021)).  The claim requires "active unconstitutional conduct."  *Id*.  "[A] failure to act" is not enough.  *Id*.

Plaintiff does not address Defendants' Motion for Summary Judgment as to Campbell's and DiGenova's supervisory liability.  As noted above, "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."  *Brown*, 545 F. App'x at 372.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Count Two.

### 4.    Qualified Immunity

Defendants also argue that they are entitled to qualified immunity.  (Doc. No. 24, PageID# 135.)  Qualified immunity protects public officials from liability under section 1983 unless they "violate clearly established statutory or constitutional rights of which a reasonable person should have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether Defendants are entitled to qualified immunity, the Court must decide (1) "whether the facts that [Plaintiff] has . . . shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [Defendants'] alleged misconduct."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted).

The Court determined above that the conduct of Defendants Collins, DiGenova, Fondriest, and Campbell did not amount to deliberate indifference.  They are thus entitled to qualified immunity since they did not violate Larrick's constitutional rights.  *Helphenstine*, 60 F.4th at 326.  For Defendants Pittman and Schwab, the Court must decide "whether the right they allegedly violated was clearly established."  *Id*.

> In *Helphenstine*, the Sixth Circuit explained:
>
> For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness must be apparent in the light of pre-existing law, but we need not find a case in which the very action in question has previously been held unlawful.  In this case, we look to see how clearly the right to be free from deliberate indifference was established at the time Helphenstine died in 2017.
>
> It has been true since 1972 that where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.  Furthermore, we reiterated in 2013 that it is clearly established that a prisoner has a right not to have his known, serious medical needs disregarded by a medical provider or an officer.  For example, over a decade ago, we denied qualified immunity to an officer who failed to seek medical assistance for an individual suffering from severe alcohol withdrawal in a situation of obvious illness even when the officer knew that the detainee was on withdrawal medication and being observed.

*Helphenstine*, 60 F.4th at 326 (internal citations, quotation marks, and brackets omitted).  As in *Helphenstine*, Larrick suffered from a serious medical need for approximately seventeen hours before her death.  Defendants did not provide her any medical assistance during that time.  Accordingly, Defendants Pittman and Schwab are not entitled to qualified immunity.  *See id*.

### 5.    Count Three: *Monell* Claim

In Count Three, Plaintiff alleges that Tuscarawas County is liable for violations of Larrick's constitutional rights.  (Doc. No. 1, ¶¶ 114-127.)

A plaintiff may not sue a municipality for injuries inflicted solely by its employees or agents under section 1983.  *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Baynes v. Cleland*, 799 F.3d 600, 622 (6th Cir. 2015); *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014); *Heyerman v. Cty. of Calhoun*, 680 F.3d 642 (6th Cir. 2012).  Rather, a plaintiff may only hold a defendant municipality liable under section 1983 for the municipality's own wrongdoing.  *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of respondeat superior.").  Or, as the Sixth Circuit has explained, "a municipality is liable under § 1983 only where, 'through its deliberate conduct,' it was 'the "moving force" behind the injury alleged.'"  *D'Ambrosio*, 747 F.3d at 388-89 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  A plaintiff may hold a municipality liable under four recognized theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence [to] federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *see also D'Ambrosio*, 747 F.3d at 386.

Plaintiff argues that Tuscarawas County is liable under the first three theories.  (Doc. No. 37, PageID# 2481.)  The Court will consider each in turn below.

### a)  Illegal Official Policy

First, Plaintiff asserts that Tuscarawas County had "unwritten policies" "to admit persons too intoxicated to be booked without obtaining medical clearance, without fully booking them in, and then to leave them in a booking cell to 'sleep it off.'"  (*Id*. at PageID# 2482.)

This theory requires that Plaintiff "identify the policy, connect the policy to the [county] itself and show that the particular injury was incurred because of the execution of that policy." *Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).  To establish an "official policy or legislative enactment, [Plaintiff] must show that there were 'formal rules or understandings—often but not always committed to writing—that were intended to, and did, establish fixed plans of action to be followed under similar circumstances consistently and over time.'"  *Id*. (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)).

The official, written policy of Tuscarawas County jail requires the booking officer to confirm that medical staff were advised as to all pertinent information about the detainee's withdrawal or possibility of withdrawal.  (Doc. No. 33-4, PageID# 2052.)  It also requires the shift sergeant or officer-in-charge to notify medical staff if there is a concern about a detainee's withdrawal when medical staff are not on site at the jail.  (*Id*. at PageID# 2053.)  Further, if a detainee is unresponsive or incoherent because of alcohol and/or drug intoxication, the official policy is to immediately transfer the detainee to the hospital.  (*Id*.)

Plaintiff contends that Defendants Pittman, Collins, and DiGenova "chose not to send [Larrick] for medical clearance, not to call medical, and not to start the Intox/Detox protocol, *in compliance with jail policy*."  (Doc. No. 37, PageID# 2482 (emphasis added).)   The evidence

establishes the exact opposite.  By not completing Larrick's booking, not notifying medical, and not adhering to the jail's intoxication and detoxification policy, Defendants were arguably directly violating the jail's formal, written policies.  Plaintiff therefore cannot "connect" these alleged "unwritten policies" to Tuscarawas County.  *See Jackson*, 925 F.3d at 829.  Plaintiff effectively seeks to hold the county liable for the actions of its employees that contravened the county's own policies. This is outside the scope of the county's responsibility under section 1983 and *Monell*.  *Morgan v. Fairfield Cty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citation omitted) ("a municipality is liable only for its own wrongdoing, not the wrongdoings of its employees").

Thus, there is no genuine issue of material fact that Tuscarawas County is not liable under Plaintiff's first theory.

### b)      Ratification by Decision-Maker

Plaintiff next argues that because the jail "performed an investigation where it found no improper conduct and issued no discipline," that means the Defendants' actions "were in compliance with official County policy and ratified by the Sheriff."  (Doc. No. 37, PageID# 2483.)

"A plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct."  *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020) (citation omitted).  The only investigation that Plaintiff identifies in her Opposition is the one that the jail performed *after* Larrick's death.  (Doc. No. 37, PageID# 2483 ("Following Larrick's death, the Jail performed an investigation . . . .").)  A ratification claim based on an inadequate investigation requires "multiple earlier inadequate investigations and they must concern comparable claims."  *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019) (citing *Leach v. Shelby Cty. Sheriff*, 891 F.2d

58

1241, 1248 (6th Cir. 1989)).  This is because the inadequate investigation "must be shown to be the moving force behind or cause of the plaintiff's harm."  *Burgess*, 735 F.3d at 479.

Plaintiff's reference to a single investigation that the sheriff initiated *after* Larrick's death is insufficient for a ratification theory.  *See Schoonover v. Rogers*, 2022 U.S. App. LEXIS 29422 at *31 (6th Cir. Oct. 21, 2022) ("Schoonover does not present additional evidence that investigations into past attacks either involved officer misconduct or resulted in the inadequate discipline.  His only reference to any investigation concerns the proceedings related to his attack, and these post hoc actions do not demonstrate that ratification was causally linked to his injuries."); *see also Spencer v. City of Hendersonville*, 2021 U.S. App. LEXIS 30313 at *15 (6th Cir. Oct. 8, 2021) ("The investigation of [the individual defendant] shows that the City did not ratify [the individual defendant's] alleged inappropriate conduct."); *Swann v. City of Columbus*, 2007 U.S. Dist. LEXIS 45766 at *8 (S.D. Ohio June 25, 2007) ("[S]ubsequent ratification of past wrongdoing cannot logically be the moving force behind the alleged constitutional violation.").  Therefore, no reasonable jury could find for Plaintiff under this theory.

### c)  Policy of Inadequate Training

A municipality can be liable under an inadequate training theory if the inadequate training "amounts to deliberate indifference to the rights of persons with whom the [COs] come into contact." *Roell v. Hamilton Cty.*, 870 F.3d 471, 487 (6th Cir. 2017) (citation omitted).  This theory requires that Plaintiff show "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of [Tuscarawas County's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused [Larrick's] injury." *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (citation omitted).  Plaintiff argues that Tuscarawas County failed

to adequately train its COs on how to "screen detainees for being drunk or high."  (Doc. No. 37, PageID# 2484.)

The Court first considers the adequacy of the training program.  Campbell testified that "meth and heroin [had] over[taken]" the jail at the time of Larrick's death.  (Doc. No. 33-1, PageID# 1358.) He further said that "most people that have come in have used drugs or alcohol before they come in." (*Id*. at PageID# 1357.)

This reality is reflected in the jail's policies.  In particular, the jail's Inmate Pre-Screen policy requires COs to "inquire about . . . [c]urrent serious or potentially serious medical . . . issues needing immediate attention."  (Doc. No. 33-4, PageID# 2104.)  This includes documenting if the inmate "has any visible signs" of alcohol or drug use.  (*Id*. at PageID# 2015.)  The jail's Inmate Receiving Screen policy requires COs to perform a more in-depth inquiry.  This includes "at least" asking the inmate about her "[u]se of alcohol and drugs including types, amount and frequency of used [sic], date or time of last use and history of any problems after ceasing use, i.e., withdrawal symptoms."  (*Id*. at PageID# 2106.)

If the detainee is exhibiting signs of drug use, then the jail's Intoxication & Detoxification policy requires COs to take a series of actions.  Of note, if the detainee discloses use of a substance "that could lead to withdrawal, or any other pertinent information, the Booking Sergeant *will* contact medical staff to advise them."  (*Id*. at PageID# 2052 (emphasis added).)  The policy also lists specific actions COs must take depending on the substance causing the intoxication or detoxification.  (*Id*. at PageID# 2053-2056.)

Based on the record, most of the COs that interacted with Larrick were unaware of these policies.[16]  Pittman testified he has never called medical because he was concerned someone was in withdrawal.  (Doc. No. 27-6, PageID# 921.)  In fact, he would only call medical when the inmate's "symptoms start becoming a life and death . . . struggle."  (*Id.*)  He did not remember receiving any intoxication or detoxification training.  (*Id.* at PageID# 838.)

DiGenova testified that he believed "the inmate might fill out paperwork" to tell the medical staff that she was going through withdrawal.  (Doc. No. 27-4, PageID# 581.)  He further testified that he would never call medical if he observed someone going through withdrawal.  (*Id.* at PageID# 581.)  He likewise testified he never received training related to drugs and alcohol.  (*Id.* at PageID# 559.)

Schwab testified that if a detainee discloses that she used drugs before her arrest, a CO would only notify medical if the detainee specified what type of drug she used.  (Doc. No. 27-1, PageID# 303-04.)  Otherwise, the CO would "just continue to check on them."  (*Id.*)  She too stated she never received formal training on drug overdose or detoxification.  (*Id.* at PageID# 301.)

Finally, Fondriest testified that he never received training on evaluating drug withdrawal, and he would use his own discretion to determine what to do if someone was going through withdrawal.  (Doc. No. 27-7, PageID# 980-81.)

From this evidence, a reasonable jury could find that Defendants were not trained on the jail's own policies about drug use, withdrawal, and when to notify the jail's medical staff, and that the jail's training—to the extent there was any—was insufficient.  *See Helphenstine*, 60 F.4th at 324

---

[16]  The only clear exception is Collins.  Collins testified that if she knew somebody was going through withdrawal, she would notify her sergeant or officer-in-charge, who in turn would notify the medical staff.  (Doc. No. 27-5, PageID# 772-73.)  She also understood that this was the jail's policy.  (*Id.* at PageID# 773.)

(concluding similarly where "record [was] mixed on whether the jailers ever received any training or instruction regarding withdrawal or medical emergencies").

The Court next considers whether this inadequacy resulted from the County's deliberate indifference.  Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted).  "If the 'unconstitutional consequences of failing to train' employees are 'patently obvious,' the county 'could be liable under § 1983 without proof of a pre-existing pattern of violations.'" *Helphenstine*, 60 F.4th at 325 (quoting *Connick*, 563 U.S. at 64).  "Asking employees to use professional judgment that lies outside their area of expertise may demonstrate deliberate indifference." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).  Here, the unconstitutional consequences of the inadequate training are patently obvious.

The fact that the jail had multiple, detailed policies on drug use, withdrawal, and when to notify the medical staff is proof that the jail understood the serious consequences that could result from not appropriately treating inmates suffering from withdrawal.  And yet Campbell testified that the jail largely left the COs' training on drug use and withdrawal to the experience they gained while on the job.  (Doc. No. 33-1, PageID# 1359.)  Engstrom agreed that most of the training was "on-the-job training."  (Doc. No. 33-3, PageID# 1921.)  And he testified that the jail did not have any "special class" on identifying medical needs due to drug withdrawal.  (*Id.* at PageID# 1936-37.)

The evidence shows a disconnect between the county's recognition of the increase in drug use and the policies needed to address it, and the training necessary to put those policies to work.  From this, a reasonable jury could find that the county's failure to train reflects its deliberate indifference to inmate health.  *See Ouza v. City of Dearborn Heights*, 969 F.3d 265, 289 (6th Cir. 2020) (in the

use of force context, concluding that the failure to provide *any* training may amount to deliberate indifference); *see also Shadrick v. Hopkins Cty.*, 805 F.3d 724, 740 (6th Cir. 2015) (lack of training "clearly eviden[t]" where defendant nurses were ignorant of detention center's protocol and policies).

Lastly, the Court considers whether this inadequacy is closely related to or caused Larrick's death. As noted in Part II.C.1(b) above, Larrick's method of death is a genuine dispute of material fact. It is not clear whether she died from intoxication due to her pre-arrest drug use (as Plaintiff maintains) or from the suspected drugs in the baggie found in her body (as Defendants argue). On these facts, a reasonable jury could find that she died from her pre-arrest drug use and its complications, which Defendants failed to notify the jail's medical staff about. *See Helphenstine*, 60 F.4th at 326 ("It is not clear whether [Helphenstine] died from fentanyl intoxication . . ., alcohol withdrawal . . ., or severe dehydration . . . . On this record, a jury could conclude that he died from withdrawal (or related complications), which was mismanaged and ignored by defendants.").

Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Plaintiff's *Monell* claim under a policy of inadequate training theory.

### 6. Counts Four through Six: State Law Claims

In Counts Four through Six, Plaintiff brings claims under Ohio law against Defendants. Ohio Revised Code § 2744.03(A)(6)(b) provides that "state employees are immune from suit unless they act . . . in a wanton or reckless manner." To act in a reckless manner means to display a "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligence conduct." *Downard v. Martin*, 968 F.3d 594, 602 (6th Cir. 2020) (quoting *Agrabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016)). "When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same

63

questions of material fact, we may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'"  *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (citation omitted).

Accordingly, because there is a genuine issue of material fact whether Defendants Pittman and Schwab acted with deliberate indifference to Larrick's serious medical need, they are not entitled to immunity from Larrick's state law claims.  *C.f. Downard*, 968 F.3d at 602.  Likewise, since the remaining Defendants did not act with deliberate indifference, they are entitled to immunity from these state-law claims.  *See id*.

### III.    Conclusion

Accordingly, for the reasons set forth above, the Court DENIES Defendants' Motion to Exclude Expert Opinions and Report (Doc. No. 28) and Plaintiff's Motion to Strike New Arguments (Doc. No. 39).  The Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment.  (Doc. No. 24.)  Specifically, the Court DENIES Defendants' Motion for Summary Judgment as to (1) Plaintiff's section 1983 claims against Defendants Pittman and Schwab; (2) Plaintiff's *Monell* claim against Tuscarawas County under a policy of inadequate training theory; and (3) Plaintiff's state-law claims against Defendants Pittman and Schwab.  The Court GRANTS Defendants' Motion as to the remainder of Plaintiff's claims.

**IT IS SO ORDERED.**


   *s/Pamela A. Barker*
   PAMELA A. BARKER
Date: September 28, 2023                 U. S. DISTRICT JUDGE